# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CT-01885-SCT

*SAMUEL ADKINS, INDIVIDUALLY AND ON
BEHALF OF THE STATUTORY WRONGFUL
DEATH BENEFICIARIES OF LINDA KAY ADKINS,
DECEASED*

*v.*

*CURREN J. SANDERS, M.D., AND SANDERS
CLINIC FOR WOMEN, P.A.*

## <u>ON WRIT OF CERTIORARI</u>

| | |
|---|---|
| DATE OF JUDGMENT: | 9/26/2000 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | BO RUSSELL |
| | WILLIAM B. GILL, III |
| | RICHARD MASSIE MARTIN |
| | DONNA S. CUMMINGS |
| ATTORNEYS FOR APPELLEES: | DONNA M. BARNES |
| | L. F. SAMS, JR. |
| | JOHN G. WHEELER |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF LEE COUNTY CIRCUIT COURT IS AFFIRMED - 04/29/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.    After the death of his wife, Linda Kay Adkins, Samuel Adkins, individually and on behalf of Linda's

wrongful death beneficiaries ("Adkins"),  filed this medical malpractice action in the Circuit Court of Lee

County, Mississippi, against defendants Curren J. Sanders, M.D., Sanders Clinic for Women P.A., and North Mississippi Medical Center. After a trial, the jury returned a verdict in favor of the defendants, and judgment was entered accordingly. Adkins appealed claiming the trial court committed reversible error in denying plaintiff's jury instruction P-21 on the applicable standard of care. Moreover, Adkins asserted that the trial court committed reversible error in refusing to excuse Juror No. 22, a patient of the defendant, for cause. The Court of Appeals reversed and remanded the case. The defendants filed a petition for writ of certiorari claiming the Court of Appeals improperly found the trial court in error with regards to the refusal of the jury instruction and the refusal to excuse Juror No. 22. We agree and find that the trial court did not commit reversible error in denying plaintiff's jury instruction regarding the applicable standard of care. Nor did the trial judge commit reversible error in refusing to excuse Juror No. 22. Accordingly, we reverse the judgment of the Court of Appeals, and we affirm the trial court's judgment.

**FACTS**

¶2.     In 1991, Linda Kay Adkins ("Linda") was diagnosed with lupus by Dr. Jean Gispen in Oxford, Mississippi. In 1993, Linda and her husband Sam Adkins discovered they were expecting their first child. Dr. Curren J. Sanders ("Dr. Sanders"), her obstetrician-gynecologist, knew of her condition. Dr. Sanders assured Linda that her lupus would not cause a problem with her pregnancy.

¶3.     On March 31, 1994, Linda was placed in North Mississippi Medical Center ("NMMC") to undergo a caesarian section. Linda gave birth to a son, Logan Adkins. Following the birth, Linda began experiencing fever. Dr. Sanders assured Linda that all women experience fever after having a baby. Linda continued to have fevers, chills, and sweats. On April 7, one week after delivery, Linda died.

2

¶4.     On October 12, 1995, Adkins timely filed a complaint in the Circuit Court of Lee County. The complaint named as defendants Dr. Sanders, the Sanders Clinic for Women, P.A. ("Sanders Clinic"), and the North Mississippi Medical Center ("NMMC").

¶5.     During voir dire at the beginning of the trial, the parties discovered that some of the prospective jurors were either patients of Dr. Sanders or another physician in Sanders Clinic., or had loved ones who had been patients of Dr. Sanders. Juror No. 22 ("No. 22"), Ms. Palmer, stated during voir dire that Dr. Sanders delivered two of her children and that she continues to see him for regular yearly checkups. Other prospective jurors stated that they had ill feelings regarding medical malpractice civil actions since they themselves were in the medical field, or they had loved ones in the medical filed. Adkins was limited to four peremptory challenges under Miss. R. Civ. P. 47(c). Dissatisfied with the potential composition of the jury, Adkins made a general oral motion to remove all "persons who had been . . . a patient of the physician, [Dr. Sanders], . . . [or] at least to the extent that someone has had a baby delivered." The circuit court denied the motion finding that "the record in this case clearly indicate[s] that I have, on my own initiative, excluded those who I considered to have any predisposition one way or the other, including those who said they didn't believe in this kind of proceeding at all."

¶6.     At trial, Adkins submitted jury instruction P-21 ("P-21"), which provided:

> When a defendant tells a patient he can achieve a good result thereby claiming he possesses the skill necessary to perform the medical care involved, the standard of care to be applied in this case is that of an rheumatologist rather than a physician having a speciality in obstetrics. Where a defendant admits that he did not possess the training or skill of a rheumatologist but, nevertheless, undertook treatment of a complicated pregnancy which requires special training and skill not possessed by the defendant, the defendant must be held to the standard of care exercised in the field in which he has claimed to be qualified.

3

During the instruction conference, the defendants objected to P-21 claiming it is "peremptory and does not...furnish any guidance to the jury as to how it should make a determination in the case." The circuit court found P-21 was peremptory and refused the instruction. The jury returned a verdict in favor of the defendants, and the trial court entered final judgment accordingly.

¶7.     Adkins filed a Motion For A New Trial Or, Alternatively, For Judgment Notwithstanding The Verdict. Adkins asserted that it was error to deny the P-21 Jury Instruction and that the trial court erred in allowing Juror No. 22 to sit on the jury. Further, Adkins asserted that "there were at least 75 additional persons who could have served had this baby patient juror been excused for cause." The circuit court denied the motion.

¶8.     Adkins timely filed a notice of appeal. The appeal was assigned to the Court of Appeals which reversed and remanded the case. *Adkins v. Sanders*, 823 So.2d 550 (Miss. Ct. App. 2002). In a 6 to 3 decision the Court of Appeals held that the trial court did not err in granting defendant's motion in limine; the trial court erred in refusing to grant plaintiff's jury instruction P-21 which held Dr. Sanders to a heightened standard of care; and the trial court erred in allowing Juror No. 22, a patient of Dr. Sanders, to be placed on the jury. On June 4, 2002, the defendants filed a Petition For Writ of Certiorari. Aggrieved by the judgment below, the defendants raise the following issues on appeal:

> I.     **Whether The Court of Appeals Properly Found The Trial Court in Error For Refusing Plaintiff's Jury Instruction No. P-21, Which Sets Out a Heightened Standard of Care For Dr. Sanders.**

> II.    **Whether The Court of Appeals Properly Found The Trial Court in Error For Not Removing Juror No. 22, a Patient of Dr. Sanders, From The Jury Panel.**

### DISCUSSION

I.      **Standard of Care.**

4

¶9.     This Court does not review jury instructions in isolation. *Jackson v. Daley*, 739 So.2d 1031, 1037 (Miss. 1999). Rather, we read the instructions as a whole. *Entergy Miss., Inc. v. Bolden*, 854 So. 2d 1051, 1054 (Miss. 2003). We will not find reversible error "where the instructions actually given, when read together as a whole, 'fairly announce the law of the case and create no injustice.'" *Id.* (quoting *Coleman v. State*, 697 So.2d 777, 782 (Miss. 1997)). If the instructions granted "adequately instruct the jury, a party may not complain of the refused instruction." *Turner v. Temple*, 602 So.2d 817, 823 (Miss. 1992) (citing *Purina Mills, Inc. v. Moak*, 575 So.2d 993, 996 (Miss. 1990); *Payne v. Rain Forest Nurseries, Inc.*, 540 So.2d 35, 40 (Miss. 1989)). Furthermore, the trial court need not charge the jury with an "instruction that 'incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" *Bolden*, 854 So. 2d at 1054.

¶10.     Dr. Sanders claims that the Court of Appeals erred in ruling that the trial court committed reversible error in refusing the plaintiff's jury instruction P-21. Relying on *West v. Sanders Clinic for Women, P.A.*, 661 So.2d 714 (Miss. 1995), Dr. Sanders argues that the heightened standard of care contained in instruction P-21 is inapplicable to this case.

¶11.     "To have an instruction granted the proponent must show that (1) the instruction is supported by the evidence and that (2) the instruction is a correct statement of the law." *Turner*, 602 So.2d at 823 (citing *Copeland v. City of Jackson*, 548 So.2d 970, 973 (Miss. 1989); *Hill v. Dunaway*, 487 So.2d 807, 809 (Miss. 1986); *Lewis Grocer Co. v. Williamson*, 436 So.2d 1378, 1380 (Miss. 1983)). *See also West*, 661 So.2d at 721. Requested Instruction P-21 provided:

> When a defendant tells a patient he can achieve a good result thereby claiming he possesses the skill necessary to perform the medical care involved, the standard of care to be applied in this case is that of a rhuematologist rather than a physician having a speciality in obstetrics. Where a Defendant admits that he did not possess the training or

5

skill of a rheumatologist but, nevertheless, undertook treatment of a complicated pregancy which requires special training and skill not possessed by the defendant, the defenant must be held to the standard of care exercised in the field in which he has claimed to be qualified.

¶12.    While the Court of Appeals found that P-21 was identical to a jury instruction previously approved by this Court in *Lewis v. Soriano*, 374 So.2d 829, 831 (Miss. 1979), we find that our decision in *Lewis* is inapplicable under the facts presented here.  In *Lewis*, this Court determined whether a physician's treatment of a patient's injuries was to be measured by the accepted standard of care of a general family physician or the standard of care of a specialist in orthopedic surgery. *Id.* at 830.  The doctor testified that the patient refused to accept his recommendations to transfer to a qualified orthopedic surgeon which were allegedly made during the first examination and frequently following treatment.  The physician admitted that the standard of care was inferior to that of an orthopedic surgeon.  *Id.*   However, since he saw no alternative,  he undertook and continued treatment.   It was uncontradicted that  the physician's recommendation was qualified as he represented that he could obtain a good result in treating the patient. *Id.* at 831.

¶13.    Since **the physician himself** said he could achieve "**a good result thereby claiming he possesses the skill necessary to perform**" the medical care involved, this Court found that recommendation to be qualified rather than unequivocal. *Id.* (emphasis added).  Because of this qualified recommendation, the physician was held to  a  standard of care expected of an orthopedic surgeon  rather than a physician having a specialty in family practice  *Id.*  The crucial factor was the physician's admission "**that he did not possess the training or skill**" of an orthopedic surgeon  "**but, nevertheless, undertook treatment of a complicated**" fracture and dislocation "**which requires special training and skill not possessed by the defendant**." *Id.* (emphasis added).

6

¶14. Unlike the physician in *Lewis*, Dr. Sanders did not admit that he assumed responsibility as a specialist in another medical discipline, i.e., as Linda's rheumatologist. He did not admit that the care that was given was inferior to the treatment she could have gotten from a specialist. Dr. Sanders did not assure that he could obtain a good result nor did he claim to possess the skills necessary to treat her condition which resulted from lupus. In fact, Dr. Sanders made significant efforts by referrals to other physicians in an effort to determine the nature of Linda's complications and the appropriate treatments. Further, the issue of whether he undertook treatment of a complicated pregnancy which required special training and skills was an issue for the jury.

¶15. This instruction effectively instructs the jury that Dr. Sanders assumed the responsibilities of a rheumatologist and undertook treatment of Linda's complicated pregnancy without having the necessary special training and skill. We find that proposed instruction P-21 was properly refused because it is peremptory.

¶16. Moreover, Plaintiff's instruction P-21 is clearly not supported by the evidence. Dr. Sanders was only responsible for Linda's obstetrical care and treatment, not treatment related to lupus nor any other rheumatological condition. Dr. Jean Gispen, a rheumatological specialist, remained primarily responsible for such treatment. Her medical records on Linda referred to the lupus as "very well controlled for years." The record also reveals that Linda declined a follow-up appointment with Dr. Gispen. Instead, with Dr. Gispen's agreement, Linda chose to keep in touch with her rheumatologist via telephone during the pregnancy. Linda chose this method instead of choosing to follow Dr. Gispen's recommendation that she come to the rheumatologist's office for a follow up visit. Although not Dr. Gispen's "first choice of management," the doctor said she was "comfortable" with Linda's choice. She also indicated approval

in the decision for Dr. Sanders to be the only physician who would personally see Linda during the pregnancy.

¶17. Dr. Sanders saw Linda on Thursday, the day the baby was delivered, and again on Friday. At these times, her postoperative condition was excellent. She showed no signs of a possible lupus flare. He was not "on call" that following weekend. Instead, Dr. White was "on call" and responsible for all of their clinic's patients, including those of Dr. Sanders.

¶18. After Dr. Sanders's visit on Friday and while Dr. White was on call, Dr. White received the report indicating that Linda's temperature was 101.3. With knowledge of Linda's smoking habit and the general anesthesia which she received during delivery, he diagnosed the source of the fever as a pulmonary complication common to smokers, not a lupus flare. He prescribed antibiotics for possible infection, Tylenol to reduce the fever, and a urinalysis to check for infection . Linda's temperature returned to normal.

¶19. When Dr. White examined Linda the next day, again, her temperature was normal. The urinalysis report indicated no infection and a normal result. Dr. White reported that, he heard "rales" (or "rattles") when listening to her lungs a common condition in smokers who have undergone general anesthesia. He encouraged mobility and cessation of smoking. He indicated no need for steroids. He reported no evidence of lupus.

¶20. On Sunday, Dr. White examined Linda again. He reported that Tylenol had eliminated the fever. He remarked that he heard fewer rales when listening to her lungs. On Sunday, Dr. White again mentioned no evidence of a lupus flare. From Sunday's visit until Monday morning when his duties to the patients of the clinic ended, Dr. White received no reports of Linda's having medical problems or complications.

¶21.     Dr. Sanders dropped in to see Linda on Sunday.  This visit is referred to as a "courtesy visit," since at that time his responsibility to his patients had been transferred to the doctor on call.  Sunday was the first time Dr. Sanders had any knowledge that Linda was not feeling well.  During this Sunday courtesy visit, she told him that she did not feel well.  He told her that he would call an internist who would  examine her for  problems associated with the delivery, especially in light of her history with lupus.

¶22.     That was the first indication to Dr. Sanders  of a possible lupus flare.  Even though not on call, Dr. Sanders consulted a specialist immediately upon suspecting any complications related to lupus.  Per Dr. Sanders's request, the internal medicine specialist, Dr. Ken Davis, Dr. Sanders, examined Linda the next day.  He reported  "no evidence of active disease at this time" and found Linda to be  "stable rheumatologically."  Dr. Davis labeled her fever as "post operative atelectasis."  Dr. Davis encouraged her to follow up with her regular rheumatologist, Dr. Gispen, when she was discharged.  He warned Linda "that her rheumatologic condition may change in her post delivery state."  Dr. Sanders referred Linda to Dr. Davis.  Dr. Sanders expected that Dr. Davis would assume responsibility for any internal complications from the delivery.  Dr. Sanders considered Dr. Davis more specialized and  better equipped to treat Linda if he detected signs or symptoms of a lupus flare.

¶23.     The next day, Dr. Sanders  saw Linda again.  Linda complained of shortness of breath. Dr. Sanders ordered a chest x-ray, an EKG and a SMA-18 ( a chemical profile of her blood).  To assure complete and competent  diagnosis and treatment, he called in Dr. Ben Moore, a pulmonary specialist, to examine her and treat any problems that he found. He expected that Linda would rely on Dr. Moore for treatment related to pulmonary problems.

¶24.     Dr. Sanders called Dr. Davis, the internal medicine specialist,  a second time after he learned of significant changes in Linda's EKG.  As a precaution, Dr. Davis recommended Linda's transfer to intensive

care. In compliance with that advice, Linda was transferred to intensive care. Dr. Sanders relinquished to Dr. Davis all responsibility for diagnosis and treatment of Linda.

¶25. While a patient in the intensive care unit, a cardiologist, a hematologist, a nephrologist and a gastroenterologist, along with Dr. Davis examined and treated Linda. However, in spite of the attention from these physicians who represented a broad range of special knowledge, her condition deteriorated until she died on April 7. In a discharge summary written by Dr. Davis, he reported that Linda had chronic pulmonary hypertension which resulted in renal failure, hepatic failure and irreversible pulmonary disease.

¶26. As Linda's obstetrician, Dr. Sanders never intended to have nor did he assume the responsibility for treatment and management of Linda's lupus. When finding possible symptoms, he called in and expected that Dr. Davis would become responsible to evaluate and treat Linda for lupus. He referred Linda to a nephrologist who was to become responsible for the diagnosis and treatment of possible hypertension. The cardiologist was expected to be responsible for evaluating her EKG response and rendering treatment for any associated problems. Further, Dr. Sanders anticipated that the pulmonary specialist would take on all responsibility to detect problems and administer any necessary treatment for conditions related to Linda's lungs.

¶27. Based on these facts, the trial court properly refused proposed instruction 21 which incorrectly draws an inference that Dr. Sanders breached a heightened duty and the expected rheumatological standard of care. Instruction 21 would have effectively instructed the jury that Dr. Sanders assumed the responsibilities of a rheumatologist and undertook treatment of Linda's complicated pregnancy without having the necessary special training and skill. There is insufficient evidence to support this instruction. In fact, the overwhelming evidence, as noted herein, is just the opposite.

10

¶28.    Furthermore, the slight, joking remark made by Dr. Sanders to Linda in the delivery room does not justify such an instruction. All parties agree that in light of the close relationship between Linda and Dr. Sanders, the remark was made "jokingly." Dr. Sanders surely did not intend to assume the duty of Linda's rheumatologist in the delivery room. Additionally, the evidence does not indicate any need for rheumatological treatment at that time.

¶29.    Dr. Sanders should not be held to a standard of care required of a rheumatologist simply because he knew about Linda's lupus when he undertook to treat her during her pregnancy as her obstetrician. His knowledge of a potential lupus flare does not result in his assumption of the rheumatologist's duties; nor does it raise the standard of care expected of Dr. Sanders to that of such a specialist.

¶30.    We find that Plaintiff's instruction P-21 is unsupported by evidence and is inappropriate under the law. Therefore, the trial court properly refused this instruction, and the Court of Appeals erred in holding that the trial court should have allowed this instruction.

## II.    Juror No. 22.

¶31.    "The selection of jurors is a 'judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.'" *Brown ex rel. Webb v. Blackwood*, 697 So.2d 763, 771 (Miss. 1997) (quoting *Scott v. Ball*, 595 So.2d 848, 850 (Miss. 1992)) S*ee also* *Davis v. State*, 660 So.2d 1228, 1258 (Miss. 1995). "This Court is required to reverse the trial court when this court clearly is of the opinion that a juror was not competent." *Fleming v. State*, 732 So.2d 172, 181 (Miss. 1999) (citing *Dennis v. State*, 91 Miss. 221, 229, 44 So. 825, 826 (1907)).

¶32.    Dr. Sanders argues that the Court of Appeals adopted a jury selection standard contrary to the authorities pronounced by this Court. He argues that a circuit court's decisions with regard to jury selection

11

are entitled to great deference and should not be easily disturbed. Dr. Sanders refers this Court to *Davis v. Smith*, 660 So.2d 1228 (Miss. 1995); *Scott v. Ball*, 595 So.2d 848, (Miss. 1992); *Hansen v. State*, 592 So.2d 114 (Miss. 1991); *Hudson v. Taleff*, 546 So.2d 359 (Miss. 1989); and *Ortman v. Cain*, 811 So.2d 457 (Miss. Ct. App. 2002).

¶33.    Adkins exhausted his allowance of four peremptory challenges. All were legitimate challenges. The four challenges were insufficient to remove individuals who had been patients of Dr. Sanders, had wives who had been patients of Dr. Sanders, or had close relatives who had been patients of Dr. Sanders. Following voir dire, Adkins made a general motion to "remove any person who has been . . . a patient of the physicians for more — at least to the extent that someone has had a baby delivered." Adkins reasoned that the jurors who had themselves had babies delivered by Dr. Sanders or had close relatives who had babies delivered by Dr. Sanders were at heightened risk for impartiality. The circuit court denied this motion, finding that there was no direct evidence of impartiality among these jurors. The juror at issue in this appeal is Juror No. 22, Palmer.

¶34.    The extent of the contact, the treating physician and other relevant details about the relationship between the clinic and the  two prospective jurors who were excluded through peremptory challenges cannot be determined from the record. As in *Scott*, counsel for Adkins did not see fit to elicit relevant details about those relationships. *See Scott*, 595 So. 2d at 851. Under our holding in *Scott*, there can be no abuse of discretion in the trial court's failure to exclude these potential jurors for cause.

¶35.    When confronted with whether to accept Palmer as a juror, Adkins had two unused peremptory challenges. The failure to use these challenges to remove Palmer from the panel bars this claim of error.

¶36.    It is well settled in this state that:

> Before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he used all of his peremptory challenges. The reason for the rule is that the appellant had the power to cure substantially any error as long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges, and suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what the appellant wholly had power to do.

*Davis v. State*, 660 So. 2d 1228, 1243-44 (Miss. 1995) (quoting *Hansen v. State*, 592 So. 2d 114, 129-30 (Miss. 1991). This rule had been applied by this Court both where the appellant had not used all of his peremptory challenges at the time he was confronted with whether to accept the juror in question and also where he chose to exercise a peremptory challenge on a juror whom he had not challenged for cause.

¶37. In *Davis*, the appellant who was convicted of capital murder and sentenced to death argued on appeal allowing Dorothy Hill to sit on the jury violated his constitutional rights to have mitigating circumstances properly considered because Hill's sister had been murdered in a robbery and her killer tried and sentenced to death. *Id.* at 1243. This issue was without merit because the appellant had one peremptory challenge left when confronted with whether to accept Hill as a juror and did not exercise that challenge to exclude her from the jury. *Id.* at 1243-44.

¶38. In *Chase v. State*, 645 So. 2d 829 (Miss. 1994), the appellant was sentenced to death for killing a man during a robbery. He challenged the trial court decision not to exclude Mary Welch for cause. Welch assured the court that her ability to remain impartial or objective would not be affected even though she had been robbed three times. *Id.* at 845. Because the appellant accepted Welch as a juror when his peremptory challenges were not yet exhausted, we refused to reverse the decision of the trial court and found the claim of error to be without merit. *Id.* at 846-47.

13

¶39. We have consistently found no error in refusal to excuse jurors who are challenged for cause when the complaining party has chosen not to exhaust his peremptory challenges. *Scott*, 595 So. 2d at 851 (citing *Capler v. City of Greenville*, 207 So.2d 339, 341 (Miss. 1968); *Chisolm v. State*, 529 So.2d 635, 639 (Miss. 1988); *Nixon v. State*, 533 So.2d 1078, 1085 (Miss. 1987); *Johnson v. State*, 512 So.2d 1246, 1255 (Miss. 1987). When an opportunity is presented to challenge a prospective juror for cause, a party may not remain silent, simply exercising a peremptory challenge, and then complain because the court refused to excuse another juror for cause upon whom he did exercise a peremptory challenge. *Scott*, 595 So. 2d at 851. To allow this practice would enable a party to increase the allotted number of peremptory challenges. *Id.*

¶40. Additionally, "varied imponderables" make the selection of a jury a "judgment call particularly within the province of the circuit court, and one which we will not on appeal second guess in the absence of a record showing a clear abuse of discretion. in jury selection." *Id*. The trial court has broad discretion to determine whether to excuse prospective jurors, even those who are challenged for cause. *Id.* Even so, that discretion is narrowed when a reasonable challenge is made and the summons of other jurors is not a great inconvenience. *Id.* at 850 (citing *Hudson v. Taleff*, 546 So. 2d 359 (Miss. 1989)). In a medical malpractice action, the trial judge must carefully evaluate the qualifications of a juror who is or has been treated by the physician or who has family who is or has been treated by the physician. *Id.* The promise of a prospective juror that he will remain impartial and that his verdict will not be affected is given great deference even given circumstances which raise questions about his qualifications. *Id.* at 850.

¶41. In *Scott*, after the court excused several potential jurors, a panel of 43 jurors remained. *Id.* at 849. When voir dire responses indicated that potential jurors or their family members had relationships

14

with Dr. Ball or his partners, Scott challenged 12 of them for cause. *Id.* The trial court sustained seven of his challenges and denied the other five. *Id.*

¶42. Scott appealed arguing that the four statutory peremptory challenges were insufficient to excuse all jurors who should have been excused for cause. *Id.* One peremptory challenge was used to exclude a juror who was not challenged for cause. *Id.* at 849-50. We upheld the trial court's refusal to dismiss a prospective juror who had been challenged for cause as the appellant chose to exercise a peremptory challenge on a juror who was not.

¶43. In *Herrington v. Spell*, 692 So.2d 93, 101 (Miss. 1997), the Herringtons asserted that allowing patients of the defendant and a witness to sit on the jury constituted reversible error. *Id.* The Herringtons contended that they were forced to exercise all their available peremptory challenges to challenge patients and former patients of the defendant and other doctors testifying. *Id.* However, the record differed with this contention as it showed that the Herringtons's attorney exercised peremptory challenges to jurors 1, 13, 15, and 19, none of whom were shown to be connected in any way to the doctors on trial or the medical profession. *Id.* During voir dire, none of the jurors showed any propensity to favor the defendant or any other member of the healthcare profession in a malpractice case. *Id.* Even so, the Herringtons chose to exercise their peremptory challenges on these individuals who were not challenged for cause instead of on the jurors about which they complained should have been excused for cause. *Id.* We refused to reverse the trial court's refusal to dismiss those individuals.

¶44. In the case at bar, Adkins clearly exercised two peremptory challenges on prospective jurors who were not challenged for cause. If there was any objection to these two jurors, it was counsel's obligation to call it to the court's attention in a challenge for cause. While the record does reflect some unspecific

15

undetermined contact between the disputed jurors and the clinic, it also confirms there was no suggestion of automatic exclusion of individuals who reported one visit or visits unrelated to childbearing and the child rearing. Having exercised his peremptory challenges on jurors who were not challenged for cause, Adkins may not complain that the trial court erred in refusing to dismiss Juror No. 22 for cause.

¶45. This case is distinguishable from *Toyota Motor Corp. v. McLaurin*, 642 So. 2d 351, 358 (Miss. 1994), where we held that the appellant's failure to exercise two of his peremptory challenges on prospective jurors who had been challenged for cause did not bar reversal because of a statistical aberration. A high number of prospective jurors or their family members had been represented by counsel for the appellee. *Id.* at 355. This resulted in a problem which could not be cured. *Id.* at 358-59. If the appellant had exercised his peremptory challenges in accordance with his challenges for cause, each of the individuals challenged for cause would have been excluded from the jury. However, that is not the case here. In the case at bar, counsel for Adkins exercised two peremptory challenges on jurors who were not challenged for cause. At the same time, Adkins complains of the seating of two jurors whom he claims should have been excused for cause.

¶46. We find that the ruling of the learned trial judge concerning the composition of the jury should not have been set aside. We will not second guess the trial judge because the record does not show a clear abuse of discretion. Further, we are unconvinced that Juror 22 was not competent to serve as a juror.

## CONCLUSION

¶47. The Court of Appeals erred in finding that the circuit court committed reversible error by refusing Plaintiff's jury instruction P-21. Moreover, we find that the Court of Appeals erred in holding that the circuit court committed reversible error by failing to excuse those jurors who were patients of Dr. Sanders

or who had close relatives who were patients of Dr. Sanders. For these reasons, the judgment of the Court of Appeals is reversed, and the judgment of the trial court is affirmed.

¶48.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED, AND THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT IS AFFIRMED.**

**WALLER AND COBB, P.JJ., CARLSON AND  DICKINSON, JJ., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**