# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-KA-02231-SCT

*NOAH BRENT CHINN*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/2005 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MICHAEL DUANE MITCHELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 06/28/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1.     Noah Brent Chinn was convicted of manslaughter and sentenced to a twenty-year prison term. Finding that the trial court erred in failing to grant a jury instruction on the defendant's theory of the case, we reverse and remand for a new trial.

### Facts

¶2.     Around 2:00 a.m. on July 31, 2004, Chinn and his wife Shaniqua arrived at the house of Latonsia and Jerry Patterson. According to Latonsia, the Chinns were "arguing and

fussing," and her husband Jerry "got in between them . . . to try to see what the problem was." Shaniqua then jumped into the Chinns' car and started to drive away. Chinn ran around the back end of the car, and Shaniqua backed the car into a fence. He then attempted to keep his wife from leaving, and during the struggle, Shaniqua was shot in the chest and killed. The Pattersons were the only two witnesses.

¶3.     Latonsia testified that she saw Chinn reach inside the car with his right hand. She then saw a flash of light and heard a gunshot, but could not see if Chinn and Shaniqua had been struggling over a gun. Latonsia then saw Chinn holding a gun, which he tossed over the fence. Chinn proceeded to pull his wife out of the car, where she stood up and took one last breath before collapsing on the ground. Chinn then lay on top of her, begging her not to die and yelling for someone to call the police.

¶4.     Jerry Patterson's testimony substantially corroborated his wife's version of events. He also stated that he could not see if the couple was struggling over a gun before it fired. However, Jerry testified that he saw Chinn with both arms inside the car. Jerry also testified that he saw Chinn's arm jerk when the gun fired. After Shaniqua had been pulled from the car, Jerry heard Chinn saying, "Baby don't leave me." According to Jerry, the defendant remained on top of his wife until the police arrived.

Both eye witnesses testified that Chinn did not have a gun before he ran to the car.

¶5.     Sergeants Robert Morris and Ken Williams arrived at the crime scene. Chinn told them that he had thrown the gun over the fence, and the officers found a Larson .380 caliber

2

semi-automatic pistol approximately forty to fifty feet from Shaniqua's body. The gun's magazine was located a couple of feet away from the gun.

¶6. The gun was registered to the defendant. Sergeant Morris testified that it had a safety switch which had to be compressed upward to enable the gun to fire. He also testified that in order to separate the magazine from the gun, a person would have to press a release at the bottom of the gun's handle.

¶7. Steve Byrd, an expert in the field of firearm evidence examination, testified that the gun was not considered to have a "hair trigger." A "hair trigger" requires less than two pounds of pressure to fire. He stated that the gun in question required seven pounds of pressure to fire. On cross-examination, Byrd admitted that the gun could have fired if two people were struggling over it.

¶8. The pathologist, Dr. Steven Hayne, testified that Shaniqua died from a single gunshot wound to her upper chest. Testing of her blood and urine revealed a blood alcohol content between .18 and .20 percent. Dr. Hayne also stated that Shaniqua had been exposed to marijuana prior to her death.

¶9. Finally, Jamie Bush, a fingerprint expert, testified that the firearm bore no identifiable fingerprints.

¶10. The defense rested without calling any witnesses.

¶11. On appeal, Chinn alleges that the trial court erred in refusing two of his proposed jury instructions because they were required to present his theory of the case that the shooting was

an accident. The State asserts that the trial court correctly refused the instructions as Chinn offered no proof that the shooting was an accident.

## Standard of Review

¶12. On review, "[j]ury instructions are to be read together and taken as a whole with no one instruction taken out of context." *Austin v. State*, 784 So. 2d 186, 192 (Miss. 2001). "A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, or is without foundation in the evidence." *Howell v. State*, 860 So. 2d 704, 745 (Miss. 2003) (citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)). "We will not find reversible error 'where the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice.'" *Adkins v. Sanders*, 871 So. 2d 732, 736 (Miss. 2004) (quoting *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997)).

¶13. Furthermore, every accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal. We have held that "[i]t is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court. This Court will never permit an accused to be denied this fundamental right." *O'Bryant v. State*, 530 So. 2d 129, 133 (Miss. 1988) (citing *Ward v. State*, 479 So. 2d 713 (Miss. 1985); *Lancaster v. State*, 472 So. 2d 363 (Miss. 1985); *Pierce v. State*, 289 So. 2d 901 (Miss. 1974)). This Court recently has stated that "[w]e greatly value the right of a defendant to present his theory of the case and 'where the

4

defendant's proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.'" ***Phillipson v. State***, 943 So. 2d 670, 671–72 (Miss. 2006) (citing ***Adams v. State***, 772 So. 2d 1010, 1016 (Miss. 2000)).

**Discussion**

¶14.   First, we must determine whether Chinn's proposed instruction properly stated the law.  Miss. Code Ann. § 97-3-17 (Rev. 2006) provides in relevant part:

> The killing of any human being by the act, procurement, or omission of another shall be excusable:
>
> (a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
>
> (b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
>
> . . . .

At trial, Chinn offered proper instructions, which tracked the language contained in subsections (a) and (b) as cited above.

¶15.   Second, we examine whether the given jury instructions covered Chinn's theory of the case.  The State gave two instructions setting forth the elements of both murder and manslaughter.  While both instructed the jury concerning self-defense, neither included an exception for an accidental shooting under Miss. Code Ann. § 97-3-17.  Therefore, Chinn's accident theory of the case was not sufficiently covered by other instructions.  *See Adkins*, 871 So. 2d at 736.

5

¶16. Finally, we look at whether there was sufficient foundation in the evidence for an accident instruction. The State is incorrect in its assertion that there was no evidentiary foundation supporting the defendant's accident theory. Even though Chinn did not present evidence on his behalf, sufficient evidence was elicited from the State's presentation of the case to support the defendant's theory. Neither of the two eyewitnesses could see inside the vehicle, and both testified that Chinn did not have a gun before he reached into the car. They also testified that after Mrs. Chinn was shot, the defendant tried to resuscitate her, pleading with her not to die.

Defense Counsel: After Ms. Chinn was on the ground what did you see?

Mrs. Patterson: I saw him laying on top of her. And he was begging her not to die, please say something. He was pumping her chest . . . he was trying to save her.

. . . .

Defense Counsel: Was he crying?

Mrs. Patterson: Yes, sir.

Defense Counsel: Okay. Was there any other statements coming from his mouth that you recall?

Mrs. Patterson: Just, Shaniqua, please don't die.

. . . .

Mr. Patterson: Shaniqua was already out on the ground when I got around there. Noah was on top of her crying. He was saying, baby, don't leave me. That's when I got on the phone and started talking with the dispatch. He stayed over with Shaniqua until the cops got there.

6

According to both witnesses, Chinn lay on top of his wife, crying, until the police arrived. Other than the foregoing, Chinn made no other statements at the scene after the shot was fired.

¶17.	The physical evidence, although minimal, also could support Chinn's theory that the shooting was an accident. Sergeant Morris testified that the weapon used was the type that automatically feeds another bullet into the chamber after being fired, so that it is instantly "ready to fire again," and later agreed on cross-examination that Shaniqua Chinn was found with only one gunshot wound. The State's expert witness, Steve Byrd, testified on cross-examination that although the gun in question was not classified as a "hair trigger," it was possible that the seven pounds of pressure needed to fire the gun could have been exerted by Chinn pulling the gun in one direction and Shaniqua pulling it in another. Finally, the fingerprints on the gun could not be identified as belonging to either Chinn or his wife. This evidence, along with the eyewitness testimony of the facts surrounding the shooting, could lead reasonable jurors to conclude that this was indeed an accidental shooting.

¶18.	Chinn was entitled to have his theory of the case submitted to the jury under proper instruction of the court. Denial of this fundamental right is grounds for reversal. As this issue is dispositive, there is no need to discuss Chinn's other claims on appeal.

¶19.	Accordingly, this case is reversed and remanded for a new trial consistent with this opinion.

¶20.	**REVERSED AND REMANDED.**

7

**WALLER, P.J., GRAVES, DICKINSON AND LAMAR, JJ., CONCUR. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, C.J., CARLSON AND RANDOLPH, JJ.**

**EASLEY, JUSTICE, DISSENTING**:

¶21. Based on the evidence actually contained in the record, Noah Brent Chinn's conviction and sentence should be affirmed. Not only has the majority muddled the actual facts in the record with its speculation and hypothesizing, the majority also has completely muddled the law in its application to the facts advanced in its opinion. Today's decision should be of interest to every attorney who practices criminal law in Mississippi, as the majority now vastly opens the door for when an accident instruction is required. Accordingly, based on the evidence presented in this case and the current law, I am compelled to dissent with the direction the majority now takes.

¶22. Chinn contends that the trial court erred in refusing proposed jury instructions D-3 and D-5, arguing that the instructions were required to be given because they set forth his theory that the shooting was an accident. The State asserts that the trial court correctly refused the instructions because there was no proof that the shooting was an accident. Chinn admits in his brief that the evidence supporting a jury instruction on the accidental discharge of the gun "was admittedly thin." However, the record reveals that there is no evidence that demonstrated that the shooting was accidental. While Chinn admittedly was not required to present any evidence or testify in order to be entitled to an accident instruction, I note that the defense rested without calling any witnesses and Chinn did not testify at trial At the very

8

least, Chinn was required to point out sufficient evidence presented in the State's case-in-chief which would justify the trial court's grant of an accident instruction.

¶23.    A detailed analysis of the facts of this case demonstrates that no evidence was presented supporting an accidental jury instruction. The State called Latonsia Patterson, a friend of Chinn and the decedent, Shaniqua, to testify. Shaniqua and Chinn, collectively "the Chinns," came to Latonsia's house at about 2:00 a.m. on July 31, 2004. The Chinns were "arguing and fussing." According to Latonsia's testimony, her husband, Jerry Patterson, opened the door and tried to separate the Chinns from each other. Shaniqua jumped into the Chinns' car; she cranked it up; and she started to leave. Chinn then ran around the back end of the car, causing Shaniqua to drive through the fence. Chinn tried to stop Shaniqua from leaving.

¶24.    Latonsia testified that she saw Chinn reach inside the car with his right hand. She then said she saw a flash of light and heard a gunshot. Latonsia could not see if Chinn and Shaniqua had been struggling over a gun. She saw that Chinn was holding a gun, which he later tossed over the fence. After he tossed the gun over the fence, he went back to Shaniqua and pulled her out of the car. Shaniqua stood up and took one deep breath as she fell. Latonsia testified that Shaniqua appeared to have a "hole in her chest." Chinn lay on top of her, begging her not to die. After Chinn tossed the gun over the fence, he yelled to call the police. Latonsia testified on redirect that she did not hear Chinn tell Shaniqua that it was an accident.

9

¶25. Latonsia's husband, Jerry, testified. Jerry testified that the Chinns arrived at his house at approximately 1:45 a.m. on the morning of July 31, 2004. Jerry corroborated Latonsia's testimony regarding the Chinns' arrival, their arguing, and Shaniqua's attempt to leave. When Jerry pulled Chinn back to separate him from Shaniqua, Shaniqua made a run for the Chinns' car. Shaniqua got inside the car and cranked it. *As she started to leave*, Chinn then ran toward the car going behind the car. *Shaniqua drove into the fence as she tried to back up in order to leave.* Chinn reached his arm inside the car's window on the driver's side. Jerry testified that he saw Chinn with both his arms inside the car. Jerry testified that he could not see any struggle over a gun before it fired.

¶26. Jerry testified that he saw Chinn's arm "come up" and then "heard a shot." He stated that Chinn's arm jerked when the gun fired. Jerry testified that his wife had a better view of the Chinns than he had. By the time Jerry could reach Shaniqua, Chinn had already pulled her from the car and was on top of her crying. He heard Chinn saying, "Baby don't leave me." Chinn remained on top of her until the police arrived and secured the scene.

¶27. Sergeants Robert Morris and Ken Williams of the Laurel Police Department worked the crime scene.[1] Chinn informed the police that the gun had been thrown over the fence. Sergeant Williams located the gun, a Larson .380 caliber semi-automatic, approximately forty to fifty feet from Shaniqua's body. Sergeant Morris testified that he processed the

---

[1] Sergeant Morris was a criminal investigator on July 31, 2004.

scene and secured the gun. The gun's clip or magazine was located a couple of feet away from the gun.

¶28. Sergeant Morris testified the gun had a safety switch which had to be compressed upward to enable the gun to fire. Sergeant Morris testified that in order to make the clip come out of the gun, an individual would have to press a release at the bottom of the gun's handle. Sergeant Morris demonstrated to the jury how the safety switch operated. He further demonstrated that the gun would not fire with the safety switch turned on, pulling the trigger. Sergeant Morris had the Bureau of Alcohol, Tobacco, and Firearms (ATF) check the gun's registration, revealing that the gun was registered to Chinn.

¶29. Steve Byrd of the Mississippi Crime Lab, an expert in the field of firearm evidence examination, testified that the gun was not considered to have a "hair trigger." Byrd was called as an expert to testify as to trigger pressure of the gun in question. Byrd stated that the pressure is measured by using trigger pull weights, which are increased in amount until the gun discharges. The gun in question required seven pounds of pressure to fire. Byrd further stated that a gun requiring less than two pounds of pressure to fire would be classified as a gun with a "hair trigger." Therefore, the gun that Byrd examined would not be classified as having a "hair trigger." Byrd further testified that the federal government does not have a standard requirement for the amount of force necessary to fire a handgun.

¶30. Dr. Steven Hayne, pathologist, testified that Shaniqua died from a single gunshot wound to her upper chest. He stated that her exact cause of death was internal bleeding. The blood alcohol content level from testing Shaniqua's urine revealed that she had BAC level

11

of .20 percent. Shaniqua's blood specimen revealed that her BAC level was .18 percent. Dr. Hayne further stated that her fluids showed that she had been exposed to marijuana prior to her death.

¶31.    Jamie Bush, an expert in latent prints employed by the Mississippi Crime Lab, testified that he examined the gun for fingerprints. However, the gun did not have any fingerprints with enough ridge detail for him to identify them. Bush testified that in only approximately eight to ten percent of firearms he examined did he find identifiable fingerprints.

¶32.    The following exchange as to jury instruction D-3 transpired:

State:          This is an accident instruction. Again, there's no evidence that justifies giving it. . . .

Defense:        [T]he State must prove that each – the State must prove that it was not an accident. And we feel like that the accident instructions would instruct the jury to that effect.

State:          [T]he State doesn't have to prove in a murder case that it was not an accident. We have to meet the elements of murder. If they want to carry that burden, they can go forward. And they hadn't presented a scintilla – . . . .

The Court:      [T]his time it will be refused because there's no evidence to that effect in this case.

¶33.    As to jury instruction D-5, the record reveals the following exchange:

The Court:      *There's no evidence in this case that it was an accident, so therefore, the Court can't allow the jury to infer from any of the – there's no evidence in this case that the jury can even infer that it was an accident.*

Defense:     Well, I think, Your Honor, with all due respect, the actions of the defendant after he pulled her out of the car trying to bring her back – trying to resuscitate her, which is uncontradicted, his emotional state and everything, it goes to show that he was trying to save her. And I think that that [sic] is absolutely an easy inference for the jury to make that this was an accident from that type of evidence.

The Court:   Be overruled. Be refused.

(Emphasis added). As stated above, Chinn's trial counsel discussed Chinn's efforts to revive Shaniqua after she was shot only when objecting to refusal of the jury instruction.

¶34.   The majority focuses on Byrd's testimony. When the record is reviewed, Byrd actually testified to the defense's *hypothetical questions*. Byrd testified as follows:

Q:     Now, let me ask you this, if there were an opposite force, let's say that you were holding that gun and I was holding that gun with my finger on the trigger and you were pulling one way and I was pulling the other way, would the force then go down to three and a half pounds to pull the trigger, assuming that we were both exerting the same force on the firearm?

A:     It would take you seven pounds of pressure to that trigger in a rearward motion for it to discharge. You could either pull that trigger yourself and or you could hold that gun and push that trigger. Seven pounds is going to be seven pounds of pressure. It's moving the trigger to the rear no matter which direction you move it from. Now, if I could control three and a half pounds and you could control three and a half pounds, together we've got seven pounds. As long as that seven pounds of pressure is going towards that trigger and forcing that trigger to the rear, yes, it would discharge.

Q:     So[,] if you were pulling the three and a half and I was pulling the three and a half in opposite directions directly affecting that trigger, it would go off if it equaled greater than seven pounds?

A:     If you are pulling in opposite directions[,] it's not going to move three and a half pounds.

13

Q: I'm saying if I takes [sic] seven – you just basically testified that if you had three and a half pounds controlled going one way and I had three and a half pounds controlled going the other way, that together we've got seven ponds [sic] and that would cause the trigger to go off?

A: No [sic] going in opposite directions. If I were pulling three and a half pounds and you were pushing three and a half pounds in the same direction[,] it's the same direction. It's still seven pounds, not in opposite directions, because three and a half pounds in opposite directions gives you nothing.

* * *

Q: I want to know – do you have that gun or is it up here?

A: It's right there.

Q: All right. It's not going to go off. We all know that. If I'm holding this gun like this and you pull on it that way and my finger is right there or if it's caught on something or if there is a mechanism, a finger, anything inside that trigger mechanism right there and that guns [sic] gets pulled this way by you, that's necessarily going to cause me to put some pounds of pressure on this trigger?

A: That's a different question. And, yes, that is possible.

¶35. From the testimony stated above, Chinn contends that Byrd testified that the gun could have been discharged accidentally. However, Byrd did not testify that the gun was accidentally discharged. Byrd simply answered a hypothetical question, which was not based on any facts in the record or testified to by any witness in the case. No testimony from any witness was presented at trial that Chinn and Shaniqua both pulled on the gun's trigger. The two eyewitnesses, the Pattersons, could not see the gun before it was fired from where they were standing. Only two people, Chinn and Shaniqua, could have seen the gun before it was

14

fired, and Shaniqua died at the scene from the gun shot. Further, no physical evidence supported the hypothetical questions.

¶36. Even on appeal, Chinn does not specify any other testimony or evidence in support of his theory that this was an accidental shooting. The only evidence that we have is that Chinn and Shaniqua came to the Pattersons' home, fighting. When Jerry Patterson tried to talk to Chinn, Shaniqua ran to the Chinns' car and tried to leave. As she backed away, Chinn reached into the car, and Shaniqua was shot. The Pattersons testified that Shaniqua ran to the car and attempted to back away when Chinn ran towards the car and reached in, causing Shaniqua to run over their fence. They testified that a gun fired, and Chinn then tossed the gun over a fence before the police arrived at the scene.

¶37. The jury convicted Chinn of the manslaughter of his wife, Shaniqua. Miss. Code Ann. § 97-3-35 (Rev. 2006) defines manslaughter as follows:

> The *killing of a human being*, *without malice*, *in the heat of passion*, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and *not in necessary self-defense*, *shall be manslaughter*.

(Emphasis added).

¶38. "This Court does not review jury instructions in isolation." *Adkins v. Sanders*, 871 So. 2d 732, 736 (Miss. 2004) (citing *Jackson v. Daley*, 739 So. 2d 1031, 1037 (Miss. 1999)). "Jury instructions are to be read together and taken as a whole with no one instruction taken out of context." *Austin v. State*, 784 So. 2d 186, 192 (Miss. 2001) (citing *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000)). "A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the

15

court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, **or is without foundation in the evidence**." *Howell v. State*, 860 So. 2d 704, 745 (Miss. 2003) (citing *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)) (emphasis added); *see Adkins*, 871 So. 2d at 740 ("There is **insufficient evidence** to support this instruction. In fact, the overwhelming evidence . . . is just the opposite.") (emphasis added); *see also Austin*, 784 So. 2d at 193. "We will not find reversible error 'where the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice.'" *Adkins*, 871 So. 2d at 736 (quoting *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997)).

¶39.    The Court of Appeals in *Robinson v. State*, 726 So. 2d 189, 194 (Miss. App. 1998), correctly affirmed the trial court's denial of an accident instruction where the evidence did not support the instruction. The court provided instructive language that is helpful when reviewing the trial court's denial of an accident instruction, stating:

> Without further evidentiary basis to support Robinson's theories of self-defense and accident, the instructions were properly denied. Simply saying that you shot in self defense or that the shooting was an accident in and of itself does not provide a defendant with an automatic right to instructions thereon. The defendant's testimony *or other evidence* must provide an evidentiary basis for the same. There was none here.

*Id*. at 194 (emphasis added).

¶40.    I find that the trial court did not err in refusing jury instructions D-3 and D-5. Since the record does not reveal that there was sufficient evidence to support a theory that the gun

discharged accidentally, the trial court's refusal of jury instructions D-3 and D-5 was proper and should be affirmed.

¶41.    For the foregoing reasons, I find that the trial court did not commit any reversible error.  Accordingly, I would affirm the judgment of the Circuit Court of the Second District of Jones County, Mississippi.

**SMITH, C.J., CARLSON AND RANDOLPH, JJ., JOIN THIS OPINION.**