# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00622-COA

**JASON SKINNER A/K/A JASON KYLE SKINNER**                                                  **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                                                            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/15/2022 |
| TRIAL JUDGE: | HON. TONI DEMETRESSE TERRETT |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 09/12/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     A Warren County Circuit Court jury convicted Jason Skinner of first-degree murder for fatally shooting Courtney Anderson at the home of their mutual friend Matthew Koestler. The trial court sentenced Skinner to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Skinner appeals, asserting three assignments of error, re-ordered as follows: (I) the trial court erred when it refused his requested imperfect self-defense manslaughter jury instruction; (II) the trial court erred by denying his requests for a mental evaluation for competency and for the viability of an insanity defense; and (III) his counsel was constitutionally ineffective for failing to request an instruction on second-degree

murder. For the reasons addressed below, we find that as to Issue I, the trial court erred when it refused to give Skinner's requested imperfect self-defense jury instruction. Accordingly, we reverse Skinner's conviction and sentence and remand this case for a new trial. Regarding Issue II, based upon the argument, evidence, and testimony in the record presented to the trial court, we find no abuse of discretion or error in the trial court's denial of Skinner's requests for a mental evaluation for competency and for the purpose of determining the viability of an insanity defense. With respect to Issue III, we find that because this case has been reversed and remanded, Skinner's ineffective-assistance-of-counsel claim is moot. *Hodges v. State*, 285 So. 3d 711, 723 (¶49) (Miss. Ct. App. 2019).

## PROCEDURAL HISTORY AND STATEMENT OF FACTS

¶2. In August 2020, a Warren County grand jury indicted Skinner for first-degree murder in violation of Mississippi Code Annotated section 97-3-19 (Rev. 2020). Prior to trial, Skinner's counsel filed a motion seeking a mental evaluation for competency to stand trial and for sanity at the time of the offense. After a hearing, the trial court denied Skinner's motion. The details of the parties' arguments and the trial court's ruling are discussed below.

### 1. The State Begins to Present Its Case

¶3. A four-day jury trial was held in May 2022. The State presented eyewitness testimony from Koestler that Skinner shot and killed Anderson in November 2019 at Koestler's home. Koestler and Anderson were longtime friends. Skinner and Anderson had been in a relationship for a few months and were temporarily living in Koestler's home after

2

Anderson's mother asked them to leave Anderson's home. Skinner, Anderson, and Koestler all struggled with drug addiction and were using drugs the evening before the shooting.

¶4. In the days before the shooting, Koestler said Skinner had become "more and more paranoid," and Koestler was afraid someone was going to end up getting hurt. In Koestler's words, "it was not a good situation." The night before Skinner killed Anderson, Koestler testified that Skinner was acting erratically. Koestler said Skinner thought "that people were trying to harm him" and that Skinner was really concerned about his "child's mother," Danielle Shoops; Skinner thought that somebody had done something to her.[1]

¶5. Koestler testified that early the next morning, he took Skinner to Shoops's house to show him that everything was fine. They drove for over an hour until Skinner settled down. After they returned to Koestler's house, Koestler went to sleep while Anderson and Skinner ran an errand. Koestler woke up around 3:30 in the afternoon and saw that Anderson and Skinner had returned. As Koestler was looking out of a window, he heard footsteps and then heard Anderson say to Skinner, "Don't walk away from me."

¶6. Koestler walked toward the kitchen and saw Anderson and Skinner there standing across from each other. Skinner then said to Anderson, "You killed Danielle," and Koestler saw a flash and heard a boom. Anderson grabbed his chest and stumbled back into the living room where he fell.

---

[1] Shoops testified for the State as a rebuttal witness. She stated that she had no children with Skinner and that no one was threatening or harming her. She was dating another man at the time.

¶7. Koestler then heard Skinner pump the shotgun, and Skinner asked Koestler, "What do you know about this?" Koestler said Skinner had the shotgun pointed at him. Koestler dove behind a wall and then heard Skinner leaving out the back door of the house. Koestler checked on Anderson and then ran to his phone and called 911. As Koestler was talking to the dispatcher, Anderson lost his pulse. Koestler started performing CPR on Anderson until emergency responders arrived. Koestler identified Skinner as the shooter and later identified Skinner to the responding law enforcement officers. Koestler said that he believed the shotgun belonged to Anderson.

### 2. Skinner Interrupts the Proceedings and Is Allowed to Read His Handwritten Statement to the Trial Court

¶8. In the middle of Koestler's testimony, Skinner interrupted and said that he "would like to say something, please . . . . I have to tell it." Skinner said that his attorney did "not know anything about this." The trial court excused the jury and recessed for lunch to allow Skinner to calm down.

¶9. When they returned, the parties met with the trial judge. Skinner's counsel told the court that Skinner had a three-to-four-page written statement that counsel had never seen, and that Skinner wanted to read it to the court. For the second time, Skinner's counsel requested a mental evaluation pursuant to Rule 12.2 of the Mississippi Rules of Criminal Procedure. Counsel told the trial court that he "[had] serious concerns about the defendant's mental condition and his ability to stand trial at this point." Counsel urged the court "to please review the document that he [(Skinner)] has in his hands [(the handwritten statement)]. He

4

won't give it to me, but I feel that the Court should review it and read it and make a determination about the defendant's mental competency." The trial court then allowed Skinner to read his statement aloud to the court.

¶10. The statement began with Skinner describing his belief that Anderson and Koestler were involved in a satanic cult:

> There is a satanic cult in Vicksburg, Mississippi. They call themselves the Vampires of Vicksburg. I'm pretty sure people have heard about this, which Courtney Anderson and Matthew Koestler are a part of. The day of the Lord is upon you. This occult [sic] consists of human trafficking, sex trafficking, money laundering, money printing, murder for hire, identity theft with murder. And they also find elderly people that live by themselves, kill them and collect their social security checks.

¶11. Continuing to read his statement, Skinner said he met Anderson in a trailer park while Skinner was "trying to find out the truth about one of my friend's death, Corey Fulg[h]am. Supposedly[,] he committed suicide." Skinner asked Anderson for a ride, and they became close friends in the following weeks. Then Skinner said that Anderson told him the "real reason" he came to the trailer park, as follows:

> [Anderson] told me that he came out to the trailer park that day because he was going to kill me because of a girl—because of a girl. Me and this girl were having sexual relations and she told a lie and said that I raped her. She was lying. And he found out the truth. If it were not the truth, then I would be dead right now.

Skinner said he asked Anderson about Fulgham, and Anderson told him that the Vampires of Vicksburg had killed Fulgham.

¶12. Skinner then described the days that preceded Anderson's death, explaining that

5

"[t]his all happened within [a three]-day period," with the first day starting at night when Skinner, Anderson, and Koestler were in Anderson's bedroom. Skinner was sitting by Anderson, "[a]nd [Koestler] looked very serious and said to me, 'Do you know who you are sitting beside?' And I said nothing and looked at [Anderson] and then back at [Koestler]. And [Koestler] said back to me, 'You're sitting beside the devil.'" Skinner said he looked at Anderson, and "[Anderson] gave me a big grin and said nothing at all. And I looked back at [Koestler,] and he said to me, '[Skinner], you could be a vampire. This could be a life changing experience.' And I said nothing and the night was over."

¶13.    Skinner said the next day, "it got a whole lot stranger." Skinner said Koestler and another man took him to a church parking lot and seemed to encourage him to fill out a contract that Skinner thought looked like a job application. Skinner said, "I was scared for my life then and knew that if I did not put something on this form they might kill me. So I filled a bunch of BS on it." Skinner said filling out the form made him feel like he was going "straight to hell," but after he completed it, "nothing happened."

¶14.    The next day, Skinner was worried about Shoops, so he asked Koestler to drive past where she was staying. Although they drove by Shoops's house, Skinner said he "did not point out where she was staying because [he] did not want [Koestler] to know where she was living and for good reason." Koestler and Skinner returned to the house, and then Anderson and Skinner left together for some errands.

¶15.    Anderson and Skinner returned to Koestler's house and went into a bedroom. Skinner

then described what happened:

> While we were in the room, I was still worried about Danielle Shoops. So I asked [Anderson] if he had Danielle's number. I did not own a phone. He didn't have it. I was sitting right beside him when I asked. Danielle was seeing a man by the name of Greg [Davis]. And I asked [Anderson] if he had Greg's number. He said yes. So he starts texting Greg to get Danielle's number. But as I was sitting there, I acted like I wasn't paying close attention to [Anderson] texting Greg. And I saw what he was doing. He was using two phone apps to act like he was texting Greg. The whole time he was texting himself to make it look like . . . Greg was texting him back. At that moment I got scared for Danielle and my child.

Skinner described what happened next:

> The shotgun was laying on the bed, and I wanted to ask [Anderson] about what he was doing on the phone. And I didn't want to ask him and him grab the gun and kill me because he would have known that I caught on to what he was doing on the phone. So I grabbed the gun and then asked him—I didn't have it pointed at him. I had it by my side. I asked him and he lied about it and said why did I pick the gun up. And he stood up and started walking towards me. I then held the gun behind me and started walking backwards through the house. We got into the living room about right where [Koestler] was sleeping and [Anderson] grabbed the gun and . . .we started fighting over the gun all the way into the sitting room and got almost into the kitchen. And I got the gun back from [Anderson's] grip and started yelling not to come any closer and said this a few times while walking backwards into the kitchen. And he started coming at me, and I was scared for my life. I slowly raised the gun up, got it to about—to my hip and the gun went off and shot [Anderson]—and shot [Anderson]. He started stumbling backwards, ran into one of the walls in the sitting room and then collapsed. I then started yelling at [Koestler] asking him if he knew anything about Danielle. He was kind of hiding behind one of the walls by the side door and was crying. I'm not sure if he knew or not, so I left him alone.

¶16.    Skinner said that he pumped the shotgun, ejected the spent shell, put it in his pocket, and wiped off the shotgun with a kitchen towel.  Skinner left the shotgun and ran out the back door.  Skinner said he ran through a stream so he "could not be tracked by dogs."  He

7

stopped and burned the "contract" that Koestler had him sign because he believed that "if the [cult] would have found it on me, they would have killed me." Skinner said he took the spent shell casing and stuck it "about two feet down" in the mud of the stream.

¶17. Afterward, Skinner said "something told" him that he needed to get to "holy ground." So he kept running to the church, but before he got there, "[he] stopped and made a makeshift cross out of some branches." Skinner said that when he got to the church, he stood in front of it "with the cross and said to myself, 'Where is everyone?' I guess I was expecting someone. And that's when the Holy of holies appeared to me in his true appearance. I did not know what I was looking at at first, and it made me fearful."

¶18. Skinner found an open door to the church and went in and blocked the door with a table. Skinner then called his father on the church's phone and told him he was in danger. When law enforcement arrived and surrounded the church, Skinner went outside and surrendered. Skinner spoke with Warren County Sheriff Martin Pace and told him that he (Skinner) "had some things [Pace] needed to see." Skinner said, "I told him that there were things that were on the same level as the yellow brick he has in his office. I knew that he would understand what that meant. I also have proof of what is going on in the world today."

¶19. Skinner described the items he gave to Sheriff Pace. There was a drawing of "four red bats," other flying bats, buildings, and flames. Skinner said that the "bats represent a plague" and that "[t]he lighter represents a fire judgment." Skinner also had a receipt that he said "represents a scroll" and some keys that he said represented "that he has power over

8

heaven and hell." Skinner said that there was another key but that it was "somewhere that nobody is ever going to find." He also gave Sheriff Pace a piece of cedar wood that he said represented "a prophet who lived in a house made of cedar." Lastly, there were phones and SIM cards that Skinner said were "the tools of Satan" and "how him and his people communicate." With that, Skinner ended his statement.

¶20. After Skinner finished reading his statement, his counsel renewed his motion for a mental evaluation. The trial court denied the motion, as will be detailed below. Court was then adjourned for the day.

### 3. The State's Case Continues

¶21. Koestler returned to the witness stand the next day to continue his testimony. Koestler confirmed on cross-examination that the shotgun belonged to Anderson. He also said that after he was cleared to re-enter his home after the shooting, he found a handgun in the room where Anderson and Skinner had stayed. A bracelet belonging to Anderson had been found on the floor next to him, and Koestler confirmed that in his prior statement to police he said, "I guess he [(Anderson)] had it on. I don't know if during the altercation if it got ripped off. I don't know." Koestler testified that he had never known the relationship between Anderson and Skinner to "g[e]t physical with them except for one time that I know of. And I don't know what happened other than I stopped by [Anderson's] old house and [Skinner] had a black eye, but I don't know what actually transpired there."

¶22. A number of police officers who responded to the scene testified at trial. They found

9

the shotgun beside the washing machine by the back door. Almost two weeks later, a spent shotgun shell was located under the stove. It matched the shotgun specifications.

¶23. As officers searched for Skinner, his father called Sheriff Pace and told him that Skinner had called him from Crossways Church on Highway 61 South. At about the same time, law enforcement received notice of an activated alarm at the same church. Officers responded to the alarm and surrounded the church, and Skinner came "running or jogging out" of a door on the side of the church. Lieutenant Jeff Merritt testified that he went inside and saw that the church office where Skinner had been was in disarray, the telephone wires were cut, a pot of coffee had been made, a door was barricaded, and a cross had been made from sticks.

¶24. Sheriff Pace testified he learned that the shooting may have been due to Skinner's concern about Shoops's safety, but Pace learned that day that Shoops was fine. Sheriff Pace testified that as Skinner was being taken into custody, Skinner gave him several items for safe-keeping, including a piece of cedar wood, a bizarre drawing, and several SIM cards.

### 4. The Defense Presents Its Case

¶25. Skinner testified in his defense. He began by re-reading the same statement he had read for the trial court earlier. After reading his statement, Skinner continued testifying. He said that he was 5'9" tall and weighed 150 pounds, while Anderson was about 6'9" and weighed 180 to 190 pounds. He further testified that he and Anderson had fought in the past, and Anderson had given him a black eye. Skinner testified that when he picked up the

shotgun on the day of the shooting and began backing away with it, "I was trying to get away from [Anderson], I mean. And I wanted to know what he was doing on the phone and I just was scared." He said he told Anderson several times to "stay back." He had no intent to kill Anderson; the shotgun just "went off."

¶26. On cross-examination, Skinner admitted that he picked up the gun when Anderson was on his phone, and at the time Anderson was not making any physical threats toward him. But then, Anderson kept walking toward him, and at that point he felt threatened. Regarding the "bat" drawing Skinner gave to Sheriff Pace, Skinner said he found it inside a book at Koestler's house, and he wrote the word "killer" on the back of it. Skinner also testified at length about an incident of "human and sex trafficking" that went on at Koestler's house when Anderson and Skinner were there. He testified that he believed Anderson was "prostituting [Shoops] out" because Anderson said another young woman would be drugged and "violate[d] . . . sexually" on that occasion. When asked whether he "evaded law enforcement because [he] thought they may be part of the cult," Skinner responded, "Yes." He also testified that he burned the "contract" because "if they would have found it on me, they'd kill me. I just shot one of their people."

¶27. The defense rested.

### 5. The State's Rebuttal

¶28. Shoops testified in rebuttal to Skinner's testimony. She said that she had no children with Skinner and had only met Anderson once. She said Anderson never harmed her and

11

was no threat to her. Shoops said that Anderson tried to contact her boyfriend, Greg Davis, through Facebook just minutes before Skinner shot Anderson. She said that Greg and Anderson "used to be friends," but Greg did not respond to Anderson because Anderson "was associated with Skinner." Greg did not want anything to do with Skinner.

### 6. The Close of All Evidence, the Jury's Verdict, and Sentencing

¶29. After the defense and the State finally rested, Skinner's counsel renewed his motion for a mental examination for a third time, noting that the trial court had now heard all of Skinner's testimony. The trial court denied the motion, as detailed below.

¶30. The jury unanimously found Skinner guilty of murder, and the trial court sentenced Skinner to life imprisonment in the MDOC's custody.

¶31. Skinner appeals.

## DISCUSSION[2]

### I. Imperfect Self-Defense Jury Instruction

¶32. Skinner asserts that it was reversible error for the trial court to refuse his proposed jury instruction on imperfect self-defense. We agree. Accordingly, we reverse Skinner's conviction and sentence and remand this case for a new trial.

¶33. We review the decision to give or refuse jury instructions for an abuse of discretion. *Brown v. State*, 222 So. 3d 302, 306 (¶19) (Miss. 2017). Our supreme court has consistently

---

[2] The standards of review applicable to each assignment of error raised by Skinner are addressed in context below.

recognized that "every accused has a fundamental right to have her theory of the case presented to a jury, even if the evidence is minimal." *Chinn v. State*, 958 So. 2d 1223, 1225 (¶13) (Miss. 2007). In other words, "it is, of course, an absolute right of an accused to have every lawful defense he asserts, even though based upon meager evidence and highly unlikely, to be submitted as a factual issue to be determined by the jury under proper instruction of the court." *Id.* (citation and internal quotation mark omitted). "In homicide cases," as here, "the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Brown v. State*, 39 So. 3d 890, 899 (¶34) (Miss. 2010) (quoting *Evans v. State*, 797 So. 2d 811, 815 (¶11) (Miss. 2000)).

¶34. Although "[a] defendant is entitled to have jury instructions given which present his theory of the case, . . . this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, or is without foundation in the evidence." *Chinn*, 958 So. 2d at 1225 (¶12) (quoting *Howell v. State*, 860 So. 2d 704, 745 (¶142) (Miss. 2003)). Mississippi's appellate courts "will not find reversible error where the instructions actually given, when read together as a whole, fairly announce the law of the case and create no injustice." *Adkins v. Sanders*, 871 So. 2d 732, 736 (¶9) (Miss. 2004) (citation and internal quotation marks omitted).

¶35. In this case, the trial court gave Skinner's requested self-defense instruction, as well as Skinner's heat-of-passion manslaughter instruction and a culpable negligence instruction.

13

But the court refused Skinner's proposed instruction on imperfect self-defense manslaughter. "Unlike true self-defense, imperfect self-defense is not a defense to a criminal act." *Bernard v. State*, 288 So. 3d 301, 313 (¶45) (Miss. 2019) (quoting *Ronk v. State*, 172 So. 3d 1112, 1126 (¶22) (Miss. 2015)). "Rather, under the theory of imperfect self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Id.* Thus, imperfect self-defense "carries with it criminal culpability and differs from the objective reasonableness of an actor engaged in true self-defense constituting a justifiable homicide." *Id.* As such, there are both "punitive and evidentiary distinctions" between true self-defense and imperfect self-defense. *Id.*

¶36. Likewise, there are key evidentiary distinctions among imperfect self-defense manslaughter and heat-of-passion manslaughter or culpable negligence manslaughter. Manslaughter, in general, is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense . . . ." Miss. Code Ann. § 97-3-35 (Rev. 2020). Heat-of-passion has been defined as "[a] state of violent and uncontrollable rage engendered by a blow or some other provocation given." *Cooper v. State*, 977 So. 2d 1220, 1223 (¶11) (Miss. Ct. App. 2007). Manslaughter by culpable negligence has been defined as "such gross negligence . . . as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding

14

circumstances as to render such conduct tantamount to willfulness." *Shumpert v. State*, 935 So. 2d 962, 967 (¶14) (Miss. 2006).

¶37. Skinner asserts that the trial court erred when it refused his proposed instruction on imperfect self-defense "because the jury might have considered heat-of-passion and culpable negligence inconsistent with Skinner's . . . self-defense theory yet may still have been inclined to find him guilty of manslaughter" based upon Skinner's "bona fide (but unfounded) belief" that shooting Anderson—whom Skinner believed was "the devil" and a satanic cult member who wanted to kill him—was necessary to prevent Anderson from killing him.

¶38. In examining this issue, we find, as an initial matter, that Skinner's proposed imperfect self-defense jury instruction adequately stated the law.[3] *See Chinn*, 958 So. 2d at

---

[3] The proposed imperfect self-defense jury instruction provided:

The Court instructs the Jury that if the defendant killed another person with an actual, genuine belief that the killing was necessary in order to protect himself from great bodily harm or death, even though that belief was not reasonable under the circumstances, then the defendant did not have the mental requirement to have committed murder. However, the killing may be manslaughter.

If you find from the evidence in this case that:

1. On or about November 27, 2019, in Warren County, Mississippi,

2. That Jason Skinner shot and killed Courtney Anderson while acting with an actual, genuine belief that the killing was necessary in order to protect himself from great bodily harm or

15

1225 (¶12) (requiring that a proposed jury instruction correctly states the law). In reviewing the other jury instructions, we further find that no other jury instruction covered this theory in any way. *Cf. Adkins*, 871 So. 2d at 736 (¶9) (finding no reversible error where "the instructions actually given, . . . as a whole, fairly announce the law of the case and create no injustice"). Indeed, the State does not assert that Skinner's imperfect self-defense jury instruction (D-3) improperly stated the law, nor does the State argue that the jury instructions, as a whole, sufficiently addressed this issue despite the trial court's decision to refuse instruction D-3.

¶39. Instead, the State asserts that an imperfect self-defense instruction was not justified because neither the State nor Skinner presented evidence to suggest Skinner had a bona fide but unfounded belief that killing Anderson was necessary to prevent great bodily harm. The State analogizes this case to the circumstances in *Young v. State*, 99 So. 3d 159, 166 (¶22) (Miss. 2012), where the supreme court found no abuse of discretion when the trial court refused to give the defendant's requested imperfect self-defense jury instruction. The State notes that in *Young*, the defendant "testified that he had armed himself in advance of confronting [the victim]," *id.*, much like Skinner did when he initially picked up the shotgun. We find, however, that this is where any similarity between *Young* and this case ends.

---

death, but

3. That belief was not reasonable under the circumstances,

Then you may find Jason Skinner guilty of the manslaughter. . . .

16

¶40.    Namely, with respect to the actual confrontation in *Young*, the supreme court specifically pointed out that "[the defendant's] own testimony was that [the victim] had pulled a gun on him first; [the victim's] pulling a weapon on him was the only reason [the defendant] offered for killing [the victim]." *Id.* Continuing, the supreme court found that "[t]aken as true, this showed that [the defendant] faced imminent danger and that his apprehension was objectively reasonable. This evidence did justify [the defendant's] proffered self-defense jury instruction, which was properly granted." *Id.* As for the imperfect self-defense instruction, "[h]owever, this evidence provides no evidentiary basis for the bona fide but unfounded belief required for an imperfect-self-defense instruction." *Id.*

¶41.    Contrary to the circumstances in *Young*, we find that the facts and testimony in this case support Skinner's imperfect self-defense theory such that the trial court should have given the imperfect self-defense instruction. In particular, Skinner testified that he believed that Anderson and Koestler were part of a satanic cult and wanted to kill him and that Anderson "was the devil." Koestler testified that Skinner became "more and more paranoid," and his actions were "erratic" in the three days leading up to the shooting. Skinner was afraid someone was trying to hurt Shoops.

¶42.    Just before the shooting, Skinner asked Anderson about Shoops. Skinner believed Anderson was "using two phone apps" to make it seem like he was texting back and forth with Shoops's boyfriend, Greg, to check on Shoops. Skinner testified, "At that moment, I

17

got scared for [Shoops] and my child." Skinner picked up the nearby shotgun because he "didn't want to ask [Anderson] and him grab the gun and kill me because he would have known that I caught on to what he was doing on the phone." Skinner and Anderson then fought over the gun, and Skinner ultimately got it away from Anderson.

¶43. As Skinner testified, he shot Anderson as Anderson came toward him because he "was scared for [his] life"; he acted out of fear, not malicious intent. On cross-examination, Skinner was asked about the reason for his fear, as follows:

THE STATE: About this being scared . . . . The fact that you said that you were scared for your life. Y'all [Anderson and Skinner] had been together. You had been living together. You'd been sleeping together. Had only one physical altercation before. But yet on that day you said that you were fearing for your life?

SKINNER: Yes, because of all the things that I went through and prior to them 3 days of him [(Anderson)] telling or [Koestler] telling me that he [(Anderson)] was the devil and then the contract thing and then that day when he was texting Greg . . . .

¶44. As stated above, a jury instruction must be given if it is supported by the evidence "no matter how meager or unlikely," and a defendant has "a right to assert alternative theories of defense, even inconsistent alternative theories." *Brown*, 39 So. 3d at 899 (¶34). Bearing these principles in mind, we find that based on Skinner's own testimony, as well as Koestler's testimony, there was sufficient evidence to have warranted an imperfect self-defense jury instruction. That is, we hold that a reasonable juror could have found Skinner acted out of fear, not malice, and that while Skinner sincerely believed shooting

18

Anderson was "necessary to prevent great bodily harm," his belief was "unfounded," as it was based on Anderson's overwhelming (but perhaps paranoid or delusional) belief that Anderson was "the devil" and wanted to kill him. Accordingly, we find that the trial court abused its discretion in refusing to give the imperfect self-defense jury instruction. *See id.* at 900 (¶36) (finding reversible error in the trial court's refusing to give an accidental-shooting instruction that the supreme court found was supported by the evidence); *Chinn*, 958 So. 2d at 1226-27 (¶18) (finding that the defendant "was entitled to have his theory of the case submitted to the jury under proper instruction of the court[, and] [d]enial of this fundamental right is grounds for reversal").

## II. Denial of Defendant's Requests for Mental Evaluation for Competency to Stand Trial and the Viability of an Insanity Defense

¶45.    As addressed above, we find that the trial court erred when it refused to give Skinner's requested imperfect self-defense jury instruction. Accordingly, we reverse Skinner's conviction and sentence and remand this case for a new trial.   Pursuant to the Mississippi Supreme Court's decision *Newell v. State*, 175 So. 3d 1260, 1268 (¶5) (Miss. 2015), we also address Skinner's assertion that the trial court erred when it did not grant his requests for a mental evaluation to determine whether he was competent to stand trial and to determine whether he was legally sane at the time of the homicide. We do so because these issues are "likely to arise once again on remand." *Id.* (holding that an appellate court should address issues that are "likely to arise once again on remand" (quoting *Brooks v. State*, 763 So. 2d 859, 864 (¶15) (Miss. 2000))); *Teal v. Jones*, 222 So. 3d 1052, 1057 (¶19) (Miss. Ct. App.

19

2017); *Allen v. State*, 212 So. 3d 98, 101 (¶1) (Miss. Ct. App. 2016). We address Issue II with the caveat that "to the extent that our analysis depends on the facts in the record before us, our decision should not be read as precluding a different result on remand if additional or different facts are presented." *Allen*, 212 So. 3d at 101 n.2.

¶46. A trial court's denial of a motion for a mental evaluation, whether to assess a defendant's competency to stand trial or a defendant's sanity, is reviewed for an abuse of discretion. *Parker v. State*, 273 So. 3d 695, 700 (¶16) (Miss. 2019); *Harden v. State*, 59 So. 3d 594, 603 (¶19) (Miss. 2011). For the reasons addressed below, we find no reversible error in the trial court's denying Skinner's requests for mental evaluation with respect to his competency to stand trial or to determine the viability of an insanity defense, with the caveat as stated above.

¶47. As an initial matter, we observe that "competency and sanity are two distinct concepts." *Parker*, 273 So. 3d at 698 (¶11). "[C]ompetency to stand trial is measured at the time of trial." *Id.* For a defendant to be held incompetent to stand trial, "there must be evidence indicating a reasonable probability that the defendant is incapable of making a rational decision." *Joiner v. State*, 240 So. 3d 1243, 1245 (¶8) (Miss. Ct. App. 2018) (citing *Jaquith v. Beckwith*, 248 Miss. 491, 500, 157 So. 2d 403, 407-08 (1963)). "By contrast, insanity—or, more precisely, a defendant's affirmative defense of not guilty by reason of insanity—is measured at the time of the criminal offense. . . . [I]ts standard is the

20

"*M'Naghten* rule,"[4] which we address below. *Parker*, 273 So. 3d at 698 (¶11).

¶48. Before addressing this assignment of error on the merits, we review Skinner's multiple requests for a mental evaluation.

### A. Overview of Skinner's Requests for Mental Evaluation

¶49. In February 2022, Skinner's counsel filed a pretrial motion requesting a mental evaluation for competency to stand trial and for sanity at the time of the offense. No exhibits were attached to that motion. At the hearing on Skinner's motion, his counsel told the trial court that in his first interviews with Skinner, he "realized that [Skinner] is suffering under a mental disease, illness, or defect such that he is not competent to stand trial and . . . he does not have the ability to aid me in his defense." Skinner's counsel offered into evidence the video recordings of Skinner's police interrogation interviews (the video recording), which was admitted without objection from the State. Referring to the video recording, defense counsel said that Skinner appears to be "suffering from a great deal of confusion . . . . And he, . . . I believe, has seen some religious delusions, which make it impossible for him to communicate properly to me and for me to prepare for his defense." Counsel further advised the trial court that "there's an amount of paranoia in his demeanor and his actions towards [me]."

¶50. Regarding the potential for an insanity defense, defense counsel asked that Skinner be examined at the Mississippi State Hospital to determine whether Skinner had a "mental

---

[4] *M'Naghten's Case*, 8 Eng. Rep. 718, 1843 WL 5869 (1843).

21

disease or defect or whether . . . [it] impaired him at the time of the crime." Upon questioning by the trial court, Skinner's counsel explained that Skinner "had no formal mental health treatment" and that Skinner told him (his counsel) that he had scheduled an appointment at Warren Yazoo Mental Health, but he did not keep that appointment. While incarcerated for the crime, however, Skinner began taking a medication called Buspar for anxiety.

¶51. Skinner's counsel also told the trial court that Skinner had used controlled substances at the time of the crime and a drug called "Kramtom" that "is not controlled but it has some psychological effects on an individual." His counsel advised that Skinner believed he was "being forced" to take the drugs by Anderson and Koestler, and Skinner's counsel added that "there's an amount of paranoia in [Skinner's] demeanor and his actions towards me and also in the statements to the police which I believe lead to a conclusion that he was under a mental disease or defect and was actively having a delusion."

¶52. To be clear, no testimony was taken at the hearing, and no affidavits were introduced. Skinner's counsel only made arguments to the trial court and relied solely upon a DVD containing the interrogation recording that defense counsel had introduced as an exhibit.

¶53. We have reviewed the video recording and observe that Skinner appeared calm throughout, providing identifying information, other personal information, and timelines without difficulty. Although Skinner requested a lawyer at one point because he needed someone to "protect [his] life," he later said that he (Skinner) should "not be in here" while

22

raising his shackled hands, and said he needed a lawyer to "help him."  Skinner initially did

not answer the detective's questions, and at no point did Skinner admit he shot Anderson.

At first, Skinner said he "wasn't there" when Anderson was shot.  Later in the interview,

Skinner said that Anderson was in a satanic cult and that Anderson and Koestler  "tried to

get me to sell my soul to the devil."  He also told the detective that he believed Anderson

wanted to kill him.   In the interview, Skinner said that Anderson was "pimping" or

"prostituting my baby's mama," and "I figured it out."  At that point, the trial court had heard

no evidence or suggestion that Shoops (the purported baby's mother) had never had a

relationship or child with Skinner.

¶54.    After reviewing Skinner's interrogation recording, the trial judge denied Skinner's

motion, ruling as follows:

> [T]he Court did have a chance to review [Skinner's police] interrogation
> [video] . . . and . . . even though it was on video, had a chance to observe his
> demeanor and listen to the statements that he made and so forth. . . . [H]is
> attorney has indicated that he may be suffering from some type of religious
> delusion that makes it a little hard to prepare and form a defense for trial.
> However, . . . looking at the video[,] it did appear that Mr. Skinner . . . had a
> calm demeanor.  He was alert.  He seemed to be cooperative with the
> investigator . . . .  And, . . . in thinking about the motion for mental evaluation,
> the Court has taken into account his educational background, personality.
> There has been some testimony earlier that there may have been some elicit
> [sic] drugs in his system. . . .  And after this incident happened, he went to the
> church where he called his father and he asked for an attorney. . . . [H]e
> seemed to know that he had rights. So he seemed to be intelligent as far as
> what he was facing. And even though his perspective may be different than,
> you know, I guess what most people would ascribe to, I'm not inclined to grant
> the motion for mental evaluation.

The trial court entered an order denying Skinner's motion for a mental evaluation on March

23

11, 2022.

¶55. Trial commenced in May 2022. As noted, Skinner interrupted the trial proceedings during Koestler's testimony. Skinner's counsel told the trial court about Skinner's handwritten statement that counsel had never seen before. For the second time, counsel requested a mental evaluation, stating as follows:

> [Skinner's] consultation with me is impaired. His thinking about this incident and the surrounding facts of this incident are bizarre. He has indicated to me that it involved and he was being recruited by a satanic cult, which involved everyone in this case, and that he was being manipulated by them and compelled to do things against his will. He included that he believed that other people were taken and disappeared by the people involved in this case. And even in his statement at the time of his arrest to the Vicksburg Police Department he stated that he need[ed] to have an attorney in order to protect his life. And he has told me that he still believes that his life is in danger from all of that.
>
> I would ask the Court to please review the document that he has in his hands [(the handwritten statement)]. He won't give it to me, but I feel that the Court should review it and read it and make a determination about the defendant's mental competency.

The trial court allowed Skinner to read his statement to the court outside the presence of the jury.

¶56. When Skinner finished reading his statement, his counsel renewed his request for a mental evaluation without providing any further information. The trial judge asked Skinner whether he would be willing to speak to his counsel about the statement he had just given. Skinner responded, "Judge, I'll do whatever I need to. I just—I had to get that out."

¶57. The trial judge denied Skinner's renewed request for a mental evaluation, explaining

24

that she asked Skinner that question "because, honestly, I don't think that this matter rises to the level that Mr. Skinner needs to be taken for a mental evaluation." Continuing, the trial judge found:

> I do agree that there are some issues there, and his perception of things may be different than our perception. But the statement he read out was very well thought out and careful, and it showed that he does have some logical thought. And . . that's his account of what happened that particular night.

¶58.   The trial judge then addressed Skinner, as follows:

THE COURT:        [I]f you are able to communicate with your attorney, I'm willing to recess court today to allow—in light of what was read out, allow the State as well as the defense attorney to . . . just see what approach you may can take when we resume back tomorrow morning.  So are you able to . . . .

MR. SKINNER:     Yes—

THE COURT:        Are you willing to continue to communicate with your attorney so he can help you throughout the rest of these proceedings?

MR. SKINNER:     That's fine. I just—it's the truth, Your Honor, and there's nothing wrong with me.

. . . .

THE COURT:        [A]nd you'll have to talk to your attorney as far as how you want to present your theory of the case. . . .

MR. SKINNER:     Yes, ma'am.

¶59.   Koestler returned the next morning to the witness stand to continue his testimony.

¶60.   After the defense and the State finally rested, Skinner's counsel renewed his motion

for a mental examination, noting that the trial court had now heard Skinner's testimony that included Skinner reading the same statement to the jury that he read to the trial court and also his testimony on cross-examination. The trial court again denied Skinner's motion, finding as follows:

> [T]he Court has had a chance to observe the defendant in the preliminary procedures as well as during the trial and hear his statements to the Court. And he does appear to . . . be intelligent under the circumstances and was able to put some thought into what he testified to. And once again, the Court is not really of the opinion just because he holds beliefs that may not be . . . [what] the average person may hold, the Court doesn't find that it's necessary to send him for a mental evaluation. So that [motion] will be denied.

¶61. We turn now to discuss the merits of Skinner's mental-evaluation assignment of error.

### B. Competency to Stand Trial

¶62. Upon review, based upon the arguments and the evidence presented to the trial court and in the light of Mississippi Supreme Court precedent, we find no abuse of discretion so as to constitute reversible error in the trial court's denying Skinner's requests for a mental evaluation with respect to his competency to stand trial.

¶63. Consistent with an accused's constitutional due process rights, a defendant "may only be tried if he is legally competent." *Joiner*, 240 So. 3d at 1244 (¶6). In this regard, Mississippi Rule of Criminal Procedure 12.1(a) provides that "to be deemed mentally competent, a defendant must have the ability to perceive and understand the nature of the proceedings, to communicate rationally with the defendant's attorney about the case, to recall relevant facts, and to testify in the defendant's own defense, if appropriate." Rule 12 further

26

provides that "[t]here is a presumption of mental competency," MRCrP 12.1(a); however, "[i]f at any time before or after indictment, the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." MRCrP 12.2(a).

¶64. The applicable standard concerns "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Parker*, 273 So. 3d at 698 (¶11) (internal quotation marks omitted) (quoting *Martin v. State*, 871 So. 2d 693, 698 (¶17) (Miss. 2004)). In determining whether the denial of a motion for a mental evaluation was an abuse of discretion, we must consider "whether the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Bradley v. State*, 116 So. 3d 1093, 1095-96 (¶14) (Miss. Ct. App. 2013) (internal quotation marks omitted) (quoting *Goff v. State*, 14 So. 3d 625, 644 (¶66) (Miss. 2009)).

¶65. "The presence of a mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial." MRCrP 12.1(a). "While there is no precise statement of what quantum of evidence necessitates a trial judge to order a mental evaluation," *Bradley*, 116 So. 3d at 1096 (¶17), we find guidance in the United States Supreme Court's observation

27

that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *see Bradley*, 116 So. 3d at 1096 (¶17).

¶66.    In this case, although the record reflects that Skinner could communicate with the police, his counsel, the trial court, and the jury, Skinner asserts that the nature of that communication was irrational.[5] According to Skinner, this is shown in the video recording of his police interrogation, his own written statement that he read to the trial court and to the jury, and his testimony during his direct and cross-examination when he testified in his own defense.

¶67.    In particular, Skinner believed that Anderson and Koestler had attempted to recruit him into the satanic cult (the Vampires of Vicksburg) and that members of the cult, especially

---

[5] We recognize Rule 12.1(a) also provides that in order "to be deemed mentally competent, a defendant must have the ability to perceive and understand the nature of the proceedings." MRCrP 12.1(a). As detailed above, Skinner's competency argument was not about Skinner's inability to understand the proceedings, but, rather, was that he could not rationally communicate with counsel. Thus, these other grounds listed in Rule 12.1(a) were not raised at trial or in Skinner's appellate brief. In his reply brief, Skinner states that "[h]is reading of the prepared statement was an indication that he did not understand the nature of the proceedings," but he offers no further argument or elaboration. Under these circumstances, we find that Skinner waived these grounds as issues for appeal. *Sanders v. State*, 678 So. 2d 663, 669 (Miss. 1996) ("We will not consider issues raised for the first time in an appellant's reply brief."); *Austin v. State*, 971 So. 2d 1286, 1288 (¶8) (Miss. Ct. App. 2008) ("It is well settled that issues not raised below may not be raised on appeal.").

28

Anderson, endangered Skinner's life. He believed that he needed a lawyer "to protect his life" and that Anderson was "pimping" Skinner's "baby mama," Shoops, and that Anderson intended to harm her. When Skinner left the scene after shooting Anderson, Skinner said he knew "that [he] needed to get to holy ground," and when he reached the church, "the Holy of holies appeared to me in his true appearance." After being taken into custody, Skinner gave several items to Sheriff Pace for safekeeping, offering unusual explanations for each one, as addressed above. Koestler also testified about Skinner's "paranoid" and "erratic" behavior in the days leading up to the shooting, Skinner's belief that people were trying to harm him, and Skinner's concern that someone had done something to Shoops, his "child's mother." Shoops testified that she had no children with Skinner, and no one was threatening or harming her.

¶68. Skinner asserts that all this information was sufficient for the trial court to have "reasonable grounds to believe Skinner was mentally incompetent," MRCrP 12.2(a), so as to require Skinner to undergo a mental examination. "[W]hen it appears to the trial court that there is a probability that defendant is incapable of making a rational defense, the trial should not proceed until the defendant's mental condition has been investigated and it appears that he is sufficiently rational to make a defense." *Emanuel v. State*, 412 So. 2d 1187, 1188 (Miss. 1982); *see also Richardson v. State*, 767 So. 2d 195, 203 (¶38) (Miss. 2000) (recognizing "there must be evidence indicating a reasonable probability that the defendant is incapable of making a rational decision"). In light of these principles, Skinner argues that

29

it was an abuse of discretion for the trial court to fail to order a mental examination.

¶69. We recognize that in *McGinnis v. State*, 241 Miss. 883, 892, 133 So. 2d 399, 402 (1961), which Skinner cites, the supreme court found that "the affidavit of the [defendant's] attorneys was sufficient to make a prima facie showing that the defendant was incapable of conferring with his attorneys and taking the stand or otherwise making a rational defense." But in *McGinnis*, the supreme court specifically observed that the State offered no evidence at all to refute the affidavit with respect to the defendant's competency to stand trial. *Id.* The supreme court further observed that "[t]his case is in a peculiar situation of subsequent events clearly showing that [the defendant] was insane upon examination by the staff at Whitfield, with the probability that such condition had also existed at the time of the trial." *Id.* at 893, 133 So. 2d at 402.

¶70. These circumstances do not exist in the case at hand. There was no medical evidence presented in Skinner's case that he had received any type of psychological treatment or assessment. Defense counsel confirmed that Skinner had not required formal mental health treatment in his life, nor had he been diagnosed with a medical condition. Although Skinner began taking Buspar for anxiety while incarcerated before trial, no evidence was offered to suggest Skinner's anxiety interfered with his ability to aid his counsel or to understand the proceedings against him. *See Richardson*, 767 So. 2d at 202 (¶38) ("We have reversed cases on the lack of a physical or mental examination, but in those cases the trial court had medical evidence presented as a basis for the order."). We further note that although Skinner had

been "guarded" in his communications with his counsel, his attorney acknowledged that Skinner had "recently" begun communicating with him about his version of the crime. The trial judge asked Skinner directly if he was comfortable communicating with his counsel about his theory of the case, and Skinner replied, "I'll do whatever I need to," and he told the trial judge, "Your Honor, . . . there's nothing wrong with me."

¶71. Skinner, however, emphasizes that his inability to *rationally* communicate with his counsel or the trial court to aid in his defense is grounds for reversal and remand for a mental evaluation. He asserts that this "information[, when] objectively considered, should reasonably have raised a doubt about [his] competence and alerted [the judge] to the possibility that [he was unable to] . . . rationally aid his attorney in his defense." *Goff*, 14 So. 3d at 644 (¶66).

¶72. Although we recognize the logic in Skinner's argument, we also recognize that in one case the supreme court "emphasize[d] that competency is the *ability* to rationally communicate with one's attorney about the case[,]" despite the defendant's "penchant for tangents, conspiracy theories, and 'rabbit holes'" relating to the defendant's theory of the drug charges against her. *Robinson v. State*, 301 So. 3d 577, 582 (¶26) (Miss. 2020).

¶73. Similar to Skinner's counsel in this case, the defendant's counsel in *Robinson* asserted that a mental evaluation was necessary "due to [the defendant's] inability to confer with her attorney in efforts to assist in her own defense, her inability to be present in and live in reality, [and] her inability to communicate with defense counsel without delving into extreme

31

conspiracy theories and delusions." *Id.* at 580 (¶18).[6]

¶74. For example, when defense counsel tried to confer with the defendant in preparation for trial, the defendant described "elaborate conspiracy theories involving foreign objects being placed in her body for cyber sex slavery, allegations of various medical and government persons performing torture on her" and made statements that "surveillance programs [were] spying on her through implanted medical devices." *Id.* at 581 (¶18). At the hearing on the motion for a mental evaluation, defense counsel told the court that she believed the defendant "could not 'distinguish what [was] real and what [wasn't] real.'" *Id.* at (¶18). The State "did not object to the motion for a mental examination." *Id.* at (¶22).

¶75. Nevertheless, the supreme court found no abuse of discretion in the trial court's refusal to allow a mental evaluation. *Id.* at 582 (¶22). With respect to the defendant's delusional behavior, the supreme court observed that the defendant "had no difficulty communicating on the record," and the record gave "no indication that [the defendant] was *unable* to assist in her defense." *Id.* at (¶26).

¶76. The supreme court also emphasized that "'the trial judge had the benefit of speaking

---

[6] The defendant in *Robinson* had also undergone a court-ordered mental evaluation in 2015 in which the defendant was found competent to stand trial. *Id.* at 580 (¶17). But during the 2015 evaluation, the defendant "was diagnosed provisionally with 'Opioid Use Disorder.'" *Id.* The evaluation cautioned that the defendant's condition "could deteriorate quickly if she becomes noncompliant with her current medications." *Id.* Defense counsel told the trial court that as far as she was aware, the defendant "was no longer taking psychiatric medications." *Id.* The supreme court's holding on this point was simply that "[t]he presence of a mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial. *Id.* at 582 (¶24).

with [Robinson] directly and observing [her] in person' and therefore that court's conclusions about Robinson's competency should not be lightly disturbed." *Id.* at (¶27) (quoting *Moore v. State*, 287 So. 3d 189, 197 (¶27) (Miss. 2020)). Relying heavily on analogous decisions, the supreme court concluded that the trial court did not err by refusing to order a mental examination,[7] citing *Moore* and *Harden v. State*, 59 So. 3d 594 (Miss. 2011).

¶77. In *Harden*, for example, the trial court refused to allow a mental examination even though the defendant "had difficulty responding to questioning by the trial court" and "stated that he did not understand the contents of the plea petition," even after the trial court allowed his lawyer to review the petition with him again. *Harden*, 59 So. 3d at 602 (¶17). The supreme court nevertheless affirmed the trial court's decision "based on the trial judge's having personally observed the defendant." *Moore*, 287 So. 3d at 198 (¶27) (citing *Harden*, 59 So. 3d at 603 (¶19)); *see Robinson*, 301 So. 3d at 583 (¶27). As the supreme court held in *Harden*, "given the broad discretion afforded to trial courts in determining whether to order a mental evaluation and competency hearing, we cannot say the ruling was outside the trial court's discretion." *Harden*, 59 So. 3d at 603 (¶19).

---

[7] We acknowledge that the supreme court in *Robinson* noted that "[t]he trial judge . . . had the benefit of observing Robinson over several *years*," including a prior proceeding in which Robinson was evaluated for his competency to stand trial. *Robinson*, 301 So. 3d at 583 (¶28); *see supra* note 5. We do not, however, find that this is a distinguishing factor from the circumstances in the case before us. The trial judge here had the opportunity to observe Skinner during his police interrogation, pretrial proceedings, and throughout trial, much like the trial judges in *Harden* or *Moore*—the two cases the *Robinson* court relied upon in concluding that the trial court did not abuse its discretion by refusing a mental evaluation in Robinson's case. *Robinson*, 301 So. 3d at 582-83 (¶¶27-28).

33

¶78.     Similarly, the *Robinson* court noted that in *Moore*, the defendant "walked out of the courthouse in the middle of his trial," "had been previously diagnosed with PTSD," and a lawyer the defendant "had attempted to hire appeared in court to say she believed Moore was 'not in his right mind.'" *Robinson*, 301 So. 3d at 583 (¶27) (quoting *Moore*, 287 So. 3d at 196 (¶23)). "Nonetheless, this Court found no error in the trial court's decision not to hold a competency hearing; we cited the trial judge's in-person observations of the defendant as one of the principal reasons to affirm." *Id.* (citing *Moore*, 287 So. 3d at 197-98 (¶27)).

¶79.     As in these cases, the trial judge here had the benefit of observing Skinner in the video recording of his police interrogation and in person during the pretrial and trial proceedings. The trial judge likewise had the benefit of questioning Skinner for the very purpose of determining whether he was able to communicate with his counsel.  Based on these observations and interactions, the trial judge found that Skinner was "calm," "alert," and "cooperative" with the police investigators, and "he seemed to know that he had rights" and seemed "intelligent as to what he was facing" during the interrogation.  After Skinner read his statement to the court, the trial judge observed that the statement was "very well thought out and careful, and it showed that he does have some logical thought." The trial judge then questioned Skinner and confirmed he would communicate with his counsel about his theory of the case.  When Skinner renewed his motion after the close of all the evidence, the trial judge again stated that she "has had a chance to observe the defendant in the preliminary procedures as well as during the trial and hear his statements to the Court. And he does

34

appear to . . . be intelligent under the circumstances and was able to put some thought into what he testified to." Based on all these interactions and observations, the trial judge found that it was not necessary to send Skinner for a mental evaluation.

¶80.   In addition to the trial judge's first-hand observations, the record reflects Skinner's ability to recall relevant facts, describe in great detail how the crime occurred, and describe what happened after he left the scene of the shooting. Further, Skinner testified in his own defense at trial. *See Tutor v. State*, 933 So. 2d 1003, 1007 (¶9) (Miss. Ct. App. 2006) (finding no error in the trial court determining defendant was competent to stand trial where defendant's "testimony on the stand indicated that he was capable of taking the stand in his own defense and could recall relevant facts as needed while testifying").

¶81.   This Court is bound to follow Mississippi Supreme Court precedent. *Edwards v. State*, 355 So. 3d 784, 790 (¶23) (Miss. Ct. App. 2023) (observing that this Court "is duty-bound to apply existing [supreme court] precedent"). "[G]iven the broad discretion afforded to trial courts in determining whether to order a mental evaluation," *Harden*, 59 So. 3d at 603 (¶19), the supreme court's decisions in *Robinson*, *Moore*, and *Harden* and our own review of the record before the trial court, we find no reversible error in the trial court's denying Skinner's request for a mental evaluation to assess his competency to stand trial in this case, subject to the caveat stated above.

### C.   Viability of an Insanity Defense

¶82.   As noted, the test for legal sanity in Mississippi is the "*M'Naghten* rule." *Parker*, 273

So. 3d at 698 (¶11). Under *M'Naghten*, the accused must show that he "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing, or (2) if he did know it, that he did not know that what he was doing was wrong." *Id.* (quoting *Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989)).

### 1. Notice of Intent to Raise an Insanity Defense

¶83. As an initial manner, the State asserts that Skinner is procedurally barred from raising this issue because Skinner did not file a notice of intent to raise an insanity defense pursuant to Mississippi Rule of Criminal Procedure 17.4(b). Specifically, Rule 12.2(b) provides that "[*i*]*f the defendant has timely raised a defense of insanity pursuant to Rule 17.4(b)*, the court, on its own motion or the motion of any party, may order the defendant to submit to a mental examination to investigate the defendant's mental condition at the time of the offense." MRCrP 12.2(b) (emphasis added). Rule 17.4(b) provides that "[i]f a defendant intends to rely upon the defense of insanity at the time of the alleged crime, the defendant shall, within the time provided for filing pretrial motions or at such later time as the court may direct, serve upon the prosecuting attorney and the clerk of the court a written notice of the intention to offer a defense of insanity." MRCrP 17.4(b)(1).

¶84. In this case, Skinner did not file a Rule 17.4(b) notice. Rather, he filed a pretrial motion seeking a mental evaluation to assess his competency as well as the *potential* viability of an insanity defense. As addressed above, this motion was followed by two subsequent requests for a mental evaluation. In *Parker*, the defendant asserted that the trial court abused

36

its discretion when it denied his motion for a mental evaluation relating to an insanity defense. *Parker*, 273 So. 3d at 696 (¶2). Although there was no mention of the defendant having filed a Rule 17.4(b) notice of intent to rely upon an insanity defense, the supreme court, nevertheless, addressed this issue on the merits. *Id.* at 700 (¶16). We likewise will do so here.

## 2. Trial Court's Discretion

¶85. In *Parker*, the supreme court began its analysis on this issue by observing that the Court of Appeals, in a plurality decision, found no error in the trial court's denying a mental evaluation where the defendant "failed to present any concrete reason establishing a mental evaluation was necessary or that Parker had a viable insanity defense." *Id.* at 701 (¶20) (internal quotation marks omitted). The supreme court agreed, holding that "given the broad discretion afforded to trial courts in determining whether to order a mental evaluation, we find no reversible error." *Id.* (citation and internal quotation marks omitted).

¶86. Abiding by the "broad discretion" we must afford the trial court in this case, *id.*, we likewise find that the trial court did not abuse its discretion when it denied Skinner's motion for a mental evaluation to assess the viability of an insanity defense based upon the facts and evidence before it.

¶87. At the first hearing on Skinner's motion for a mental evaluation, the only evidence offered was the DVD of Skinner's police interrogation recording. As detailed above, Skinner remained "calm" throughout the interview process as the trial judge indicated in her ruling.

He recited his social security number, provided details about relationships and timelines, and signed his name when his rights were read to him. Skinner said he should "not be in here" while raising his shackled hands. Skinner never admitted that he shot Anderson. Indeed, early on, Skinner said he "wasn't there" when Anderson was shot.

¶88. Skinner never mentioned "vampires" or "Vampires of Vicksburg" during the interview. And when the detective asked about Skinner running to the church, Skinner never indicated—as he did later in open court—that he was seeking shelter from vampires or the devil. He said he went there because it was holy ground. Skinner did talk about a satanic cult; Anderson and Koestler's trying to get him to "sell [his] soul to the devil"; and Anderson's wanting to kill him. Also, as noted, Skinner claimed that Anderson was "prostituting my baby's mama." We find it relevant, however, that no testimony or evidence was presented (at this time) that the alleged "baby's mama" never had a relationship or a baby with Skinner.

¶89. Based on the information presented and available to the trial court at the time of the February 2022 hearing, we find that the trial court did not abuse its discretion when it denied the request for a mental evaluation.

¶90. Likewise, at trial, when defense counsel renewed Skinner's motion for a mental evaluation, he only stated to the trial court that the "surrounding facts of this incident are bizarre" and that Skinner was "being recruited by a satanic cult." Defense counsel then asked the trial court to review the document Skinner had "in his hands." The court stopped

the trial and allowed Skinner to read the statement he had written. Without further information being provided by the defense, the trial court denied the motion. We find no abuse of discretion in the trial court's determining that the information presented, while strange, did not rise to the level requiring a mental evaluation. We reach the same conclusion when defense counsel renewed his motion for a mental evaluation at the close of all the evidence.

¶91. We specifically note that in making its rulings, the trial court had to consider the timing of Skinner's disclosures, together with the fact that he still was being compliant and responding appropriately. It is feasible that under these circumstances, the timing of Skinner's disclosures could be construed as manipulative and an attempt to stop or disrupt the legal proceedings against him. In sum, based upon the information before the trial court as a whole, we simply cannot say that the trial court abused its discretion by denying Skinner's requests for a mental evaluation as to a potential insanity defense.

¶92. We also observe that Skinner's own testimony, including his recollection of the crime and his conduct afterward, shows that he knew the nature of his action—shooting Anderson—and that he knew it was wrong.

¶93. First, Skinner's description of the shooting shows that he understood his actions and that he could distinguish right from wrong. *See Woodham v. State*, 800 So. 2d 1148, 1158 (¶29) (Miss. 2001) ("Essentially, the test is whether the accused did not know right from wrong at the time of committing the act."); *Hogan v. State*, 89 So. 3d 36, 39 (¶10) (Miss. Ct.

39

App. 2011). Skinner testified that he regained control over the shotgun after he and Anderson had fought over it. Skinner told Anderson to "stay back" three times. Anderson was coming "at" Skinner when he was shot. Skinner said he was not trying to kill Anderson and only wanted to get away from him "when the gun went off." As Skinner explained it, when Anderson began walking toward him, he did not know if he was going to shoot him "or if [Anderson] was going to come at [him]," so he shot Anderson "because [he] was scared."

¶94. Second, Skinner's conduct after the shooting shows he knew what he had done and that it was wrong. After he shot Anderson, Skinner took a number of actions to remove evidence. He wiped down the shotgun with a towel, removed the shell casing, put it in his pocket, and then ran from the scene:

> [After shooting Anderson] I then pumped the shotgun, got the shot shell casing and put in my pocket. I grabbed one of the kitchen towels and wiped the shotgun off and went into the laundry room, shut the laundry room door and set the shotgun down and ran out the back door and kept running in a straight path behind [Koestler's] house.

¶95. In fleeing Koestler's home, Skinner testified that he ran through "a little stream in the woods behind [Koestler's] house. I ran in the stream so that I could not be tracked by dogs. I knew they would be able to pick up my scent." Skinner also testified that he "took the used shell casing and stuck it about two feet down in the stream about arm's length."

¶96. Skinner then "kept running" to the church, barricading himself in a church office, surrendering only after the police had surrounded the building. Although at one point in his police interrogation Skinner said he needed a lawyer "to protect his life," he also stated that

40

he "needed a lawyer to help him," which certainly could be taken to mean "help him" with his legal defense.

¶97. Skinner asserts that he began running after the incident because he feared the satanic cult was going to kill him for shooting Anderson, not to avoid the police. But Skinner also specifically testified at trial that he would not have shot Koestler, though he was an eyewitness to the crime, and, according to Skinner, Koestler also was a member of the satanic cult that Skinner so greatly feared. As such, we find that this alternative reason for Skinner's flight is unpersuasive. *See States v. State*, 88 So. 3d 749, 758 (¶37) (Miss. 2012) (recognizing that "[g]enerally, evidence of flight is admissible as evidence of consciousness of guilt").

¶98. Skinner also takes issue with the trial court's noting, for example, that Skinner's "perception of things may be different than our perception," appearing to assert that this should have triggered a reasonable belief that a mental evaluation was necessary. But even if this statement reflected the trial court's concern that Skinner was mentally ill, "[t]he presence of a mental illness, defect, or disability alone is not grounds for finding a defendant incompetent to stand trial," MRCrP 12.1(a), nor does it constitute insanity without proof of the other factors addressed above. *See Parker*, 273 So. 3d at 700-01 (¶¶19-20).

¶99. We reiterate that the determination of whether a mental examination is warranted "rests largely within the discretion of the trial judge. [She] sees the evidence first hand; [she] observes the demeanor and behavior of the defendant." *Nelson v. State*, 749 So. 2d 388, 391

41

(¶8) (Miss. Ct. App. 1999). Here, in particular, the trial judge heard Skinner's testimony about the circumstances surrounding the shooting and his actions following the shooting, as described above. For the reasons stated, we find no abuse of discretion in the trial court's refusal to grant Skinner's requests for a mental evaluation to assess the viability of an insanity defense in this case based upon the information and arguments presented.

## CONCLUSION

¶100. In sum, we find no abuse of discretion in the trial court's denial of Skinner's requests for a mental evaluation as to competency and the availability of an insanity defense based upon the argument and information before it,[8] but we find that the trial court erred by refusing Skinner's requested imperfect self-defense jury instruction. Accordingly, we reverse the conviction and sentence and remand for a new trial. *See Teal*, 222 So. 3d at 1063 (¶37) (finding error in the trial court's giving the proposed spoliation jury instruction and reversing and remanding for a new trial even though appellate court found "no abuse of discretion in any of the trial court's challenged evidentiary rulings"). Additionally, because we reverse and remand this case for a new trial, the ineffective-assistance-of-counsel issue that Skinner asserts as his third assignment of error is presently moot. *Hodges*, 285 So. 3d at 723 (¶49) (recognizing that "our supreme [court] has held that if a case is reversed on other

---

[8] As noted above, we addressed Issue II because it is likely to arise again on remand, *Newell*, 175 So. 3d at 1268 (¶5), but with the caveat that our analysis is based upon the argument, evidence, and testimony in the record before us. "[O]ur decision should not be read as precluding a different result on remand if additional or different facts are presented." *Allen*, 212 So. 3d at 101 n.2.

grounds, a claim of ineffective assistance is moot").

¶101. **REVERSED AND REMANDED.**

**BARNES, C.J., GREENLEE, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McDONALD, J. JOINS IN PART.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶102. I agree with the majority's thoughtful and detailed opinion in many respects, but given the extreme delusions Jason Skinner was experiencing, I believe there were reasonable grounds to order a psychological evaluation. Otherwise, we risk putting to trial a person who is not mentally competent to understand what is happening and cannot rationally communicate to his attorney.

¶103. In Mississippi, under precedent and rule, "[a] criminal defendant is presumed competent." *Moore v. State*, 287 So. 3d 189, 196 (¶21) (Miss. 2020); *accord* MRCrP 12.1(a) ("There is a presumption of mental competency"). "The burden of proof rests on the defendant to prove that he is mentally incompetent to stand trial." *Moore*, 287 So. 3d at 196 (¶21).

¶104. Our Supreme Court has determined that a competent defendant is a person

> (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense

43

if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.

*Id.*

¶105. This decision is one for the trial court, and we simply ask "whether the trial judge received information which, objectively considered, should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Id.* at (¶22) (internal quotation marks omitted). We review for abuse of discretion. *Id.*

¶106. And if "the court, on its own motion or the motion of any party, has reasonable grounds to believe that the defendant is mentally incompetent, the court shall order the defendant to submit to a mental examination." MRCrP 12.2(a).

¶107. One should have been ordered in this case. As counsel for Skinner points out, the defendant "maintained that he was fearful of what he referred to as a satanic cult," believed the victim was a member of it, thought the cult was pursuing him, and had been "holed up" in a church where "officers found a makeshift cross fashioned from sticks," and the sheriff later "testified that . . . Skinner gave him several items for safe keeping including a piece of cedar wood, a bizarre drawing, and several SIM cards."

¶108. Perhaps most troubling, Skinner seemed to believe that Danielle Shoops had been murdered—she *was not*—and that he had a child with her—he *did not*. Critically, Skinner's belief that all this was real does not seem to be in dispute.

44

¶109. The majority is right that Skinner had some concept of reality and the legal system. But that is not the test. The test is if knowing the above facts "should reasonably have raised a doubt about the defendant's competence and alerted the judge to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense." *Moore*, 287 So. 3d at 196 (¶22). This was not an isolated incident of Skinner malingering or creating a fanciful story but instead a complicated pattern of delusion and confusion that both Koestler, the witness, and John Bullard, his appointed lawyer, observed.

¶110. Indeed, at the first hearing held in this case, the lawyer told the trial court, "In my first interviews with Jason Skinner, I realized that he is suffering under a mental disease, illness, or defect such that he is not competent to stand trial and not competent or not -- he does not have the ability to aid me in his defense." The lawyer urged the trial judge to watch recorded interviews with his client and told the trial court, "I believe [he] has . . . some religious delusions, which make it impossible for him to communicate properly to me and for me to prepare for his defense."

¶111. The United States Supreme Court has held that "[n]o one questions the existence of the fundamental right" to be tried only when one is competent. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). That Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." *Id.* (internal quotation mark omitted). This fundamental right is so essential that when the record so clearly reveals a

45

question about a defendant's competency, the best route for us to travel is to simply order an examination.

¶112. The trial court most certainly is in the best position to make that call, but under this record—replete with fear of a satanic cult, an imaginary baby, and a defendant barricading himself in a church—it was an abuse of discretion not to order a mental competency examination.

¶113. Perhaps Jason Skinner is competent to stand trial; perhaps he is not. Due Process requires that we simply check.

**WESTBROOKS, J., JOINS THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**